[Cite as *Simmers, Chief, Div. of Oil & Gas Resources Mgt. v. N. Royalton*, 2016-Ohio-3036.]

## IN THE COURT OF APPEALS OF OHIO

## TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Richard J. Simmers, Chief,<br>Division of Oil & Gas Resources<br>Management, | : | |
| | : | |
| Appellant-Appellant, | : | |
| | : | No. 15AP-900 |
| v. | : | (C.P.C. No. 15CV-42) |
| City of North Royalton, | : | (REGULAR CALENDAR) |
| Appellee-Appellee. | : | |

### D E C I S I O N

### Rendered on May 17, 2016

**On brief:** *Michael DeWine*, Attorney General, *Daniel J. Martin* and *Brian A. Ball*, for appellant. **Argued:** *Daniel J. Martin.*

**On brief:** *Thomas Kelly*, Law Director, and *Donna Vozar*, for appellee. **Argued:** *Thomas Kelly.*

APPEAL from the Franklin County Court of Common Pleas

TYACK, J.

{¶ 1} This is an appeal by Richard J. Simmers, Chief of the Division of Oil & Gas Resources Management ("chief" and "division"), from an August 27, 2015 decision and judgment of the Franklin County Court of Common Pleas affirming a December 13, 2014 order of the Ohio Oil and Gas Commission ("commission") vacating the division's issuance of the chief's Mandatory Pooling Order 2013-181. For the reasons that follow, we affirm the judgment of the court of common pleas.

**FACTUAL AND PROCEDURAL BACKGROUND**

{¶ 2}   In Ohio, oil and gas owners and operators who want to drill wells must apply for a drilling permit pursuant to R.C. 1509.06.  The application is then reviewed and a final decision made by the chief to determine whether a drilling permit will be issued. R.C. 1509.06 includes provisions for spacing and location of the wells and special considerations and conditions for wells proposed in urban areas.

{¶ 3}   A drilling unit is the minimum acreage on which one well may be drilled. R.C. 1509.01(G).   Owners of adjoining tracts of land may agree to pool their tracts to form a drilling unit that conforms to the acreage and distance requirements set forth in the statutes.  *See* R.C. 1509.26.  However, if a tract of land is of insufficient size or shape to meet drilling requirements, and adjacent landowners are unable to form a drilling unit by agreement "on a just and equitable basis," an owner may apply to the division for a "mandatory pooling order" under R.C. 1509.27.  The mandatory pooling process allows the chief to override individual landowners' concerns and involuntarily pool affected landowners.  The landowners are compensated for the mandatory pooling.

{¶ 4}   Beginning in 2007, Cutter Oil had entered into a number of oil and gas leases with appellee, the City of North Royalton, Ohio.  In a 5-year time span, North Royalton had participated in at least 12 separate Cutter Oil wells.  Initially, there was a good working relationship between the city and Cutter Oil.  At some point, Mr. C.J. Cutter assured the city that Cutter Oil would never utilize the mandatory pooling provisions of R.C. 1509.27 in its attempts to enter into leases of city property.

{¶ 5}   Cutter Oil operates approximately 17 oil and gas wells in North Royalton. There are at least six previously drilled Cutter Oil wells located within 5,000 feet of the newly proposed Cutter Oil well at issue in this case.  Six additional non-Cutter Oil wells are also sited within 5,000 feet of the newly proposed Cutter Oil well.

{¶ 6}   Since 2008, there have been three reported incidents involving Cutter Oil wells which presented safety concerns to the city government.  The three incidents were: (1)  In 2008, a steel rod, approximately one-half inch in diameter and 700 feet long was ejected from Cutter Oil's Valley Vista #1 Well, under pressure, and in the immediate vicinity of an elementary school, with an attendant oil spray that required containment; (2) In August 2011, there was a leak from a section of a production line associated with

Cutter Oil's Callas #2 Well, resulting in oil entering the municipal storm sewer leading to Chippewa Creek; and (3) In March 2012, there was a release of natural gas from Cutter Oil's Callas #1 Well, in which the incident resulted in the evacuation of several residences for a period of time.

{¶ 7} On April 5, 2013, Cutter Oil applied for a drilling permit and a mandatory pooling order comprised of approximately 24 acres in order to drill an oil and gas well known as the Callas #8HD Well in an urbanized area of the city of North Royalton, Ohio. The well was to be approximately 4,000 feet deep and would also run horizontally for 591 feet. The well would be the first horizontal well drilled in North Royalton and would be the first horizontal well drilled or operated by Cutter Oil in any location.

{¶ 8} Under the rules governing the spacing of wells, the required drilling unit could not be less than 20 acres, the well had to be no less than 300 feet from the boundary of the proposed drilling unit and, because it was in an urbanized area, it could not be closer than 75 feet to any property not within the tract. Approximately two acres of unleased municipal city streets were proposed to be mandatorily pooled into the Callas #8HD drilling unit. Thus, the city of North Royalton was an affected property owner required to join the pool.

{¶ 9} Cutter Oil had applied for mandatory pooling before the North Royalton City Council had completed its public meetings and deliberations regarding the proposed lease. On May 14, 2013, the city of North Royalton conducted a public meeting pursuant to R.C. 1509.61 regarding the proposed lease for the Callas #8HD Well. On the same day, the mandatory pooling application also came on for hearing before the Technical Advisory Council on Oil & Gas ("TAC"). TAC tabled consideration of the application to allow time for the public notice and meeting requirements of R.C. 1509.61. Eventually, the North Royalton City Council voted unanimously to defeat the proposed lease agreement. TAC, however, unanimously recommended approval of the mandatory pooling application.

{¶ 10} On December 10, 2013, the division issued chief's Order 2013-181, the mandatory pooling order approving Cutter Oil's application for mandatory pooling for the Callas #8HD Well. On the same day, the division also issued a drilling permit for the Callas #8HD Well.

{¶ 11} The city of North Royalton appealed the issuance of the chief's order to the commission. On appeal, the commission considered whether Cutter Oil's negotiations with North Royalton were conducted "on a just and equitable basis" as required by R.C. 1509.27.

{¶ 12} The commission found that the financial considerations, including the royalty amount and signing bonuses offered to North Royalton, were generous by both industry standards and as compared to offers extended to voluntary lessors participating in the drilling unit. The commission also found that the chief limited his evaluation of the lease negotiations to the issue of whether a reasonable monetary offer had been extended to North Royalton and that he did not consider the history between Cutter Oil and the city or the city's safety concerns in his evaluation. The chief took the position that safety issues are addressed through the drilling permit application process and by the imposition of permit conditions.

{¶ 13} The commission disagreed with the chief that negotiations on a "just and equitable" basis contemplated only economics. It found that the area of North Royalton under consideration is heavily developed with oil and gas wells, which are densely sited and located in close proximity to homes, schools, and neighborhoods. The commission found that the financial aspects of an offer may not be the primary consideration for the city in determining whether to enter into an oil and gas lease, but safety may be much more important to the city than any potential financial compensation.

{¶ 14} The commission found that with the exception of removing a secondary oil recovery provision from an early version of the proposed lease, Cutter Oil made no other efforts to address safety concerns raised by the city in its lease negotiations. The city attempted to raise safety concerns at the TAC hearing, but by limiting review of the lease negotiations to financial aspects, the safety concerns of the city were not taken into account and effectively negated.

{¶ 15} The commission found that the city raised legitimate safety concerns given that the Callas #8HD Well would be the first horizontal well drilled in North Royalton and Cutter Oil's first horizontal well. It found that both Cutter Oil and the city were inexperienced with regard to horizontal drilling and the operation of a horizontal well.

The fact that the horizontal well was to be drilled in a residential neighborhood and into a shallow formation presented legitimate safety concerns.

{¶ 16} The commission found that the scope of the division's evaluation was too limited and should have been based on a fuller record than just the financial terms offered for the lease. The commission found that the chief acted unreasonably in limiting his consideration of whether Cutter Oil was unable to secure a voluntary lease with the city of North Royalton "on a just and equitable basis" to the financial aspects of Cutter Oil's offer to lease. The commission vacated the chief's order and remanded the matter to TAC to consider the safety issues and concerns of the city. After such a hearing, the commission expected the chief to take into account the findings and conclusions of the commission in making any further orders regarding the mandatory pooling application.

{¶ 17} The chief appealed to the Franklin County Court of Common Pleas. The court of common pleas considered whether the chief's order was properly vacated and remanded by the commission. The court noted that the "just and equitable basis" concept is not defined in a statute, and it afforded deference to the commission's own view of the law in this regard. The court noted that in earlier cases the commission had ruled that the just and equitable basis requirement in R.C. 1509.27 means that an owner-applicant like Cutter Oil must use all reasonable efforts in lease negotiations, which contemplates both a reasonable monetary offer and sufficient efforts to advise the other landowners of the same. But the court noted that other considerations, not simply economics, may also be important on a case-by-case basis. In particular, safety issues may be an important consideration in lease negotiations.

{¶ 18} The court found that it would be illogical to construe the law in a manner that ignored potential safety issues, particularly where local government property in an urban area is involved. The court concluded that in deciding the case the commission was correct in concluding that property owners' concerns over financial terms are important, but sometimes even more important will be concerns over intangible rights like safety. The court then affirmed the order of the commission with the caveat that the chief could use TAC as he saw fit, consistent with R.C. 1509.38, in his further review of the mandatory pooling case.

**ASSIGNMENTS OF ERROR**

{¶ 19} On appeal to this court, the chief raises the following four assignments of error:

> [I.] The trial court erred in affirming the Commission's mandate that the Chief separately consider safety concerns in his analysis of the offers made by the applicant when safety considerations are reviewed and considered by the Division and the Chief through the permit application process that takes place concurrently with the mandatory pooling review process.
>
> [II.] The Court erred in concluding that the Chief afford greater scrutiny to mandatory pooling applications when the application requests mandatory pooling municipal property.
>
> [III.] In prior Commission precedent that the trial court did not address or distinguish, the Commission rejected or failed to adopt the argument that review of safety concerns related to drilling in an urban environment must be considered by the Chief in reviewing a mandatory pooling application.
>
> [IV.] The trial court erred in reading *Johnson v. Kell* to require the Chief to consider safety considerations in reviewing a mandatory pooling application.

{¶ 20} Assignments of error one, three, and four all pertain to one issue and will be addressed together. In determining whether a mandatory pooling order should be granted, are financial considerations the only appropriate criteria to consider or may other factors, such as safety concerns, play a significant role in the lease negotiations under review by the chief?

**STANDARD OF REVIEW**

{¶ 21} The standard of review on an appeal for the common pleas court from the commission is whether the commission's order was reasonable and lawful. *Martz v. Div. of Mineral Resources Mgt.*, 10th Dist. No. 08AP-12, 2008-Ohio-4003, ¶ 13; *Johnson v. Kell*, 89 Ohio App.3d 623, 625 (10th Dist.1993).

{¶ 22} "If the court finds that the order of the commission appealed from was lawful and reasonable, it shall affirm the order. If the court finds that the order was unreasonable or unlawful, it shall vacate the order and make the order that it finds the

commission should have made. The judgment of the court is final unless reversed, vacated, or modified on appeal." R.C. 1509.37.

{¶ 23} "Unlawful" is defined as that which is not in accordance with law, while "unreasonable" is defined as that which is not in accordance with reason or that which has no factual foundation. *Johnson*, citing *Citizens Commt. to Reserve Lake Logan v. Willia*ms, 56 Ohio App.2d 61, 70 (10th Dist.1977).

{¶ 24} Upon appeal to this court from the court of common pleas, however, our standard of review is more restrictive. *Childs v. Oil & Gas Comm.,* 10th Dist. No. 99AP-626 (Mar. 28, 2000), citing *Lorain City Bd. of Edn. v. State Emp. Relations Bd.*, 40 Ohio St.3d 257, 260-61 (1988). This court determines if the common pleas court abused its discretion. *Id.* However, on questions of law, the common pleas court does not exercise discretion, and this court's review is plenary. *Childs*, citing *Univ. Hosp., Univ. of Cincinnati College of Med. v. State Emp. Relations Bd.,* 63 Ohio St.3d 339 (1992); *B & D Drilling v. State*, 10th Dist. No. 02AP-52, 2002-Ohio-5010, ¶ 12.

{¶ 25} To summarize, the chief had to determine if certain procedural formalities were met, whether mandatory pooling was necessary to protect correlative rights and to provide effective development, use, and conservation of oil and gas, and whether adjoining landowners were unable to form a drilling unit by agreement on a just and equitable basis.

{¶ 26} The commission had to determine whether the chief acted lawfully and reasonably in approving Cutter Oil's application for mandatory pooling.

{¶ 27} The court of common pleas had to determine whether the commission's order vacating and remanding the chief's order was reasonable and lawful.

{¶ 28} This court must determine whether the court of common pleas abused its discretion in affirming the order of the commission.

**ANALYSIS**

{¶ 29} "It is the public policy of the state of Ohio to encourage oil and gas production when the extraction of those resources can be accomplished without undue threat of harm to the health, safety and welfare of the citizens of Ohio." *Newbury Twp. Bd. of Twp. Trustees v. Lomak Petroleum*, 62 Ohio St.3d 387, 389 (1992). The history of oil and gas development in Ohio has been largely one of state regulation, with local

governmental interests being restricted, but not entirely disregarded. In *State ex rel. Morrison v. Beck Energy Corp.*, 143 Ohio St.3d 271, 2015-Ohio-485, ¶ 1, the Supreme Court of Ohio stated that Chapter 1509 of the Revised Code preserves certain powers for local governments while giving state government sole and exclusive authority to regulate the permitting, location, and spacing of oil and gas wells. Within the backdrop of this policy, we consider the parties' arguments.

{¶ 30} In *Jerry Moore, Inc. v. State of Ohio*, Ohio Oil and Gas Board of Review, Appeal No. 1 (July 1, 1966), the Oil and Gas Board of Review established two conditions precedent under R.C. 1509.27 for an owner to make application to the division for a mandatory pooling order. First, is the tract of land of insufficient size or shape to meet the requirements for drilling a well as provided in R.C. 1509.24 or 1509.25? And second, has the owner been unable to form a drilling unit under a voluntary pooling agreement as provided in R.C. 1509.26 on a just and equitable basis?

{¶ 31} The meaning of a "just and equitable basis" was addressed in the *Jerry Moore* case as follows:

> ...unless the parties themselves so agree, the Chief of the Division of Oil and Gas shall determine, preferably after advice from the Technical Advisory Council, whether the owner-applicant has been unable to form such drilling unit under voluntary pooling agreement provided in Section 1509.26, Ohio Revised Code, and whether such owner-applicant has used all reasonable efforts to enter into a voluntary pooling agreement. Using "all reasonable efforts" contemplates both a reasonable offer and sufficient efforts to advise the other owner or owners of the same.

*Id.* at 19.

{¶ 32} Here, Cutter Oil applied for a mandatory pooling order before the city had completed its deliberations, including a public meeting mandated by R.C. 1509.61. This suggests that Cutter Oil did not use all reasonable efforts to reach a voluntary pooling agreement with the city of North Royalton prior to applying for a mandatory pooling order.

{¶ 33} The chief's primary argument against the commission considering safety is that a review of safety considerations is made at the drilling permit stage, and that such a

review at the mandatory pooling stage is not necessary or appropriate. Essentially, the chief argues that since safety is considered during review of the drilling permit application, safety can never be addressed during the mandatory pooling process.

{¶ 34} The chief is correct in his assertion that an application for a mandatory pooling order must be accompanied by an application for a drilling permit. R.C. 1509.27 provides in pertinent part that an application for a mandatory pooling order "shall be accompanied by an application for a permit." R.C. Chapter 1509 provides specific grounds for the chief to deny a permit, including denial if the chief determines there is a "substantial risk that the operation will result in violations of this chapter or rules adopted under it that will present an imminent danger to public health or safety or damage to the environment." R.C. 1509.06(F); *City of Munroe Falls v. Chief, Div. of Mineral Resources Mgt.,* 10th Dist. No. 10AP-66, 2010-Ohio-4439, ¶ 15.

{¶ 35} In *City of Munroe Falls*, the city argued against granting a drilling permit because drilling in close proximity to water well fields created a substantial risk of contamination to the city's water supply. *Id.* This court found that the commission's decision affirming ODNR's issuance of the drilling permit was lawful and reasonable because the statutory framework governing issuance of drilling permits requires minimization, not complete elimination, of risks associated with drilling, and the trial court did not abuse its discretion in concluding that the permit appropriately addressed those risks. *Id.* at ¶ 17.

{¶ 36} In order for the chief to deny a drilling permit there must be a "substantial risk" of an "imminent danger to public health or safety or damage to the environment." R.C. 1509.06(F). In the city of North Royalton there may be safety issues—with long lasting consequences—that can arise, such as the burden that drilling activity places on a municipality's public resources, the negative impact of drilling activity on streets and other infrastructure, or the safety of a municipal water supply, that do not rise to the level of imminent danger, but are of sufficient concern to the city that it wishes to negotiate such terms in a drilling lease.

{¶ 37} The drilling permit process may not provide sufficient protection to a municipality concerned about particular safety issues, where the standard of proof for denial of a permit is imminent danger, whereas the mandatory pooling process allows for

arms-length negotiations between the parties on a just and equitable basis using all reasonable efforts as contemplated by the statute and prior commission precedent.

{¶ 38} In this case, we are not persuaded that the history between the parties and the safety concerns the city of North Royalton raised before the TAC were ever considered at the drilling permit stage or during the chief's review process. This court has found that the legislature clearly contemplated that issuance of a drilling permit would be a relatively straightforward ministerial act. *Barclay Petroleum, Inc. v. Ohio State Dept. of Natural Resources*, 10th Dist. No. 00AP-592 (Mar. 13, 2001). In *Barclay*, this court noted that R.C. 1509.06(N) provided that "the chief shall issue a permit within seven days of the filing of the request unless he denies the application by order." R.C. 1509.06 has been amended since then and currently, R.C. 1509.06(C)(1) states in pertinent part that: "the chief shall issue a permit within twenty-one days of the filing of the application unless the chief denies the application by order." We do not find that the additional two weeks changes the ministerial nature of the drilling permit process.

{¶ 39} In *Johnson*, this court held that: "The chief must find that mandatory pooling is necessary to protect every participating landowner's correlative rights, not just those who voluntarily pool. The impact on the unwilling participant who would be forced to pool must be taken into account." *Id.* at 628. As the common pleas court noted, *Johnson* stands for the proposition that the impact of oil and gas development must be considered against the backdrop of surrounding property even land not directly forced into the mandatory pool. (Aug. 27, 2015 Decision and Final Judgment, 6.) Here, the commission found that the city of North Royalton raised legitimate safety concerns given that the Callas #8HD Well would be the first horizontal well drilled in North Royalton and Cutter Oil's first horizontal well. (Commission Order, 26.) It further found that both Cutter Oil and the city were inexperienced with regard to horizontal drilling and the operation of a horizontal well. (Commission Order, 26.) The Commission found that the fact that the horizontal well was to be drilled in a residential neighborhood and into a shallow formation presented legitimate safety concerns. (Commission Order, 26.)

{¶ 40} In *Johnson*, this court also held that the commission is given wide latitude in admitting new evidence, making factual determinations, and viewing the facts of the case. *Id.* at 627. In order to determine whether lease negotiations were undertaken on a

just and equitable basis, it may be necessary to consider factors other than finances in order to understand the impact of mandatory pooling on affected landowners. Thus, it was reasonable for the commission to conclude that focusing solely on economic factors was too narrow of a view given the overall purposes of the mandatory pooling statutes. In considering all the evidence, the commission found there have been numerous drilling permits issued in North Royalton, and along with increased drilling activity, there had arisen a series of safety and operational issues regarding those wells. Substantial municipal resources were expended in addressing those issues. In light of the experiences the city has had with Cutter Oil drilling sites, it is not surprising that the city has taken a more cautious approach to the drilling of the Callas #8HD Well. The urbanized environment, the inexperience of Cutter Oil in drilling a horizontal well, and prior safety incidents with other Cutter Oil wells in the community are of special concern to the city that is not only a landowner, but a governmental entity charged with the responsibility to protect the health, safety, and welfare of its citizenry.

{¶ 41} Additionally, R.C. 1509.61 requires local governments to conduct public meetings concerning any lease agreements in urbanized areas. It makes no sense to create a mechanism whereby the public can voice its concerns about oil and gas drilling in an urban environment just to have those concerns brushed aside by the TAC and the chief when reviewing mandatory pooling orders in urbanized areas. By enacting the public meeting statute, the legislature must have recognized that something more than pure economics must be considered before a political subdivision enters into a lease agreement for the development of oil and gas in an urbanized area.

{¶ 42} Finally, the chief's position conflicts with the overall public policy of the State of Ohio concerning the health, safety, and welfare of its citizens as articulated in *Newbury Twp. Bd. of Twp. Trustees*, quoted above. Furthermore, it appears that the safety concerns of the residents and public officials of North Royalton were dismissed and not considered by TAC, and that at no point did the chief consider the history between Cutter Oil and the city or the city's safety concerns in his evaluation either in the mandatory pooling process or when granting the drilling permit.

{¶ 43} For all these reasons, we find that the common pleas court did not abuse its discretion in affirming the commission, and we overrule the first, third, and fourth assignments of error.

{¶ 44} In the second assignment of error, the chief asserts that the common pleas court ruled that the chief must afford greater scrutiny to mandatory pooling applications where the application requests mandatory pooling of municipal property.

{¶ 45} We believe this assignment of error misstates the ruling of the common pleas court.  The common pleas court did not order greater scrutiny of Cutter Oil's mandatory pooling application because one of the involuntary landowners was a municipality.  Rather, the commission and the court of common pleas examined the specific facts of this case, including the problems involved in locating an oil and gas well in an urbanized area, the specific history and dealings between the parties, and the history of safety problems with other Cutter Oil wells in North Royalton.  This led the commission and the common pleas court to conclude that under these circumstances, when applying the "just and equitable basis" test to a mandatory pooling application, the chief must look beyond the financial factors before granting mandatory pooling.

{¶ 46} The second assignment of error is not well-taken.

**CONCLUSION**

{¶ 47} Based on the foregoing, we overrule the four assignments of error.  The judgment of the Franklin County Court of Common Pleas is affirmed.

*Judgment affirmed.*

BRUNNER, J., concurs.
SADLER, J., concurring in part and dissenting in part.

SADLER, J., concurring in part, dissenting in part.

{¶ 48} I agree with the majority's disposition of appellant's second assignment of error.  However, because I believe that the trial court erred when it affirmed the decision of the commission, I would sustain appellant's first, third, and fourth assignments of error and reverse the judgment of the trial court.  Because the majority does not, I respectfully concur in part and dissent in part.

{¶ 49}  In *Morrison v. Beck Energy Corp.*, 143 Ohio St.3d 271, 2015-Ohio-485, the Supreme Court of Ohio made the following observations regarding the regulation of oil and gas mining in Ohio:

> Article II, Section 36 vests the General Assembly with the power to pass laws providing for the "*regulation* of methods of mining, weighing, measuring and marketing coal, *oil, gas and all other minerals.*"  With the comprehensive regulatory scheme in R.C. Chapter 1509, the General Assembly has done exactly that.

(Emphasis sic.)  *Id.* at ¶ 34.  The Supreme Court also stated:

> In its current form, R.C. 1509.02 centralizes regulatory authority in state government, entrusting a division of ODNR with "sole and exclusive authority to regulate the permitting, location, and spacing of oil and gas wells and production operations" within Ohio.

*Id.* at ¶ 4.

{¶ 50}  The court in *Morrison* also discussed the permitting process set out in R.C. Chapter 1509:

> A state permit is *essential* for any person seeking to drill a new well * * *. An applicant may obtain a permit through the procedures outlined in R.C. 1509.06, and the division chief must promulgate standards for obtaining a permit, including standards that address the safety of well drilling and operation, protection of the public and private water supply, fencing and screening of surface facilities, waste containment and disposal, construction of access roads, and noise mitigation. R.C. 1509.03(A); *see also* Ohio Adm.Code Chapter 1501:9-1. The regulations also establish well spacing and setback requirements based on the depth of the well and the well's proximity to other wells and private dwellings.  *See* Ohio Adm.Code 1501:9-1-04(C), and 1501:9-1-05.

(Emphasis sic.)

{¶ 51}  In this case, appellant applied for a permit to construct a horizontal well at Callas #8HD.  The chief granted the application.  Despite the majority's conclusion that it is "not persuaded that the history between the parties and the safety concerns the city of North Royalton raised before the TAC were ever considered at the drilling permit stage or

during the Chief's review process," there is no argument in this case that appellant failed to satisfy the mandatory permitting requirements of R.C. 1509.06.[1]  (Majority Decision, ¶ 38.)  This appeal deals only with the chief's mandatory pooling order which required the chief to determine whether an applicant has made reasonable efforts to reach a voluntary pooling agreement on a just and equitable basis.

{¶ 52}  R.C. 1509.27 permits the chief to issue mandatory pooling orders, in relevant part, as follows:

> The application shall include information as shall be reasonably required by the chief of the division of oil and gas resources management and shall be accompanied by an application for a permit as required by section 1509.05 of the Revised Code.  The chief shall notify all mineral rights owners of tracts within the area proposed to be pooled by an order and included within the drilling unit of the filing of the application and of their right to a hearing.  After the hearing or after the expiration of thirty days from the date notice of application was mailed to such owners, *the chief, if satisfied that the application is proper in form and that mandatory pooling is necessary to protect correlative rights and to provide effective development, use, and conservation of oil and gas, shall issue a drilling permit and a mandatory pooling order* complying with the requirements for drilling a well as provided in section 1509.24 or 1509.25 of the Revised Code, whichever is applicable.

(Emphasis added.)

{¶ 53}  R.C. 1509.01(I) defines the term "correlative rights" as follows:

> "Correlative rights" means the reasonable opportunity to every person entitled thereto to recover and receive the oil and gas in and under the person's tract or tracts, or the equivalent thereof, without having to drill unnecessary wells or incur other unnecessary expense.

{¶ 54}  In this appeal, the chief has taken the position that R.C. 1509.27 does not permit him to consider safety issues when making a determination whether an applicant has made reasonable efforts to reach a voluntary pooling agreement on a just and

---

[1] The chief's issuance of a permit for an oil and gas well is not an "order of the Chief" for purposes of an appeal to the commission pursuant to R.C. 1509.36.  *Chesapeake Exploration, L.L.C. v. Oil & Gas Comm.*, 135 Ohio St.3d 204, 2013-Ohio-224, ¶ 11.

equitable basis. The city argues that an applicant does not use reasonable efforts to reach a voluntary pooling agreement on a just and equitable basis when the applicant fails to negotiate additional safety measures and assurances of future regulatory compliance and asked the chief to require appellant to negotiate lease provisions regarding mining safety and regulatory compliance as a condition to obtaining a mandatory pooling order. Importantly, the city does not seek lease terms providing greater compensation than that which has been offered by appellant.

{¶ 55} The commission agreed with the city stating that, under R.C. 1509.27, the chief may consider the applicant's "[a]ssurances that a well will be operated in the safest manner possible, and in full compliance with all safety standards of the law" in determining whether the applicant has made a reasonable effort to reach a just and equitable pooling agreement. (Commission Decision, 25.) The commission reasoned that non-economic factors may be relevant to lease negotiations in this instance given the fact that the applicant and the city are "inexperienced with regards to horizontal drilling," and the fact that "a horizontal well will be drilled in a residential area."[2] (Commission Decision, 26.) The commission also cited the parties' history "includes incidents that have raised safety concerns for the City officials." (Commission Decision, 25.)

{¶ 56} In upholding the commissioner's order, the trial court concluded that the order was neither unreasonable nor unlawful. The majority affirms the decision of the trial court. As support for this conclusion, both the trial court and the majority in this case rely on this court's decision in *Johnson v. Kell*, 89 Ohio App.3d 623 (10th Dist.1993).

{¶ 57} In my analysis, *Johnson* has been misinterpreted. In *Johnson*, the applicant, Robert Kleese, sought a mandatory pooling order that would encompass 1.4 acres of appellant's 13-acre tract. Kleese claimed that he made reasonable efforts to negotiate lease terms that were just and equitable when he offered to pay royalties to appellant at the standard industry rate for the 1.4 acres of appellant's 13-acre tract that Kleese needed to meet the statutory minimum. Appellant argued that the offer was not

---

[2] The General Assembly has addressed legitimate concerns regarding the safety of its citizens by enacting the comprehensive regulatory scheme of R.C. 1509, including provisions regarding wells to be located in urbanized areas and the construction of horizontal wells. The comprehensive regulatory scheme also contains enforcement procedures and sanctions to address legitimate concerns regarding compliance.

just and equitable because it did not adequately compensate him for his correlative rights. The Oil and Gas Board of Review agreed with appellant. The trial court overturned the board's ruling.[3]

{¶ 58} In reversing the judgment of the trial court, this court held that the factual findings made by the board provided adequate support for the Board's order. In so holding, this court reasoned as follows:

> Kleese's proposed well would offset by 1,102 feet an existing profitable well drilled by appellant's family's oil and gas company. Kleese had only made two offers to appellant. The original offer was $ 100 per acre for 1.4 acres pursuant to the terms of a nondrilling oil and gas lease. This offer was made in a letter dated April 17, 1989, after Kleese had leased or pooled additional adjacent properties. The second offer was a total of $ 2,000 for 1.4 acres pursuant to a nondrilling oil and gas lease. * * * The board held in an earlier decision that *the more a proposed well approaches being an "offset well," the more the value of the offer must increase* in order to constitute a just and equitable pooling agreement. The board noted that Kleese did not offer to pool appellant's entire thirteen acres prior to the issuance of the chief's order. Kleese's two offers, therefore, *limited appellant's share of the royalties to a small percentage, as no other offer to participate was made. Further, the offer did not adequately compensate appellant for the likely adverse impact on his existing well.*
>
> The above factual findings support the board's conclusion that Kleese's attempts to pool voluntarily were not conducted on a just and equitable basis. It was error, therefore, for the trial court to conclude that the board's order was unlawful and unreasonable.

(Emphasis added.) Id. at 626-27.

{¶ 59} It is evident from this court's analysis in *Johnson* that we authorized the board to consider the impact of non-economic factors only to the extent that those factors affect the value of the unwilling participant's "correlative rights" as defined in R.C 1509.01(I). Thus, in *Johnson*, this court determined that the standard royalty rate did not

---

[3] The Oil and Gas Board of Review is now the Oil and Gas Commission. R.C. 1509.36; *Childs v. Oil & Gas Comm.*, 10th Dist. No. 99AP-626 (Mar. 28, 2000).

represent just and equitable compensation in light of the relevant non-economic factors demonstrating that appellant's correlative rights were of greater monetary value. *Id*. at 628. Accordingly, *Johnson* does not support the commission's view here that the chief may consider the applicant's efforts to negotiate issues of *safety and regulatory compliance* when determining whether the applicant has used reasonable efforts to reach a pooling agreement that is just and equitable. Rather, the *Johnson* case supports the view that the sole responsibility of the chief in reviewing a mandatory pooling application is to determine whether the applicant has made an offer that represents just and equitable compensation for the unwilling participants correlative rights.

{¶ 60} In my view, both the trial court and the commission failed to appreciate the distinction between the city's fundamental rights as a property owner and the city's "correlative rights" as an unwilling participant in a mandatory pooling arrangement. In a mandatory pooling arrangement, the applicant obtains all or part of the unwilling participant's mineral rights. In return for those rights, the unwilling participant is to "receive the oil and gas in and under the person's tract or tracts, *or the equivalent thereof*, without having to drill unnecessary wells or incur other unnecessary expense." R.C. 1509.01(I). The unwilling participant in a mandatory pooling arrangement retains all other ownership rights in the real property.[4]

{¶ 61} Similarly, I do not agree with the majority's conclusion that the chief's mandatory pooling order conflicts with the general statement of public policy expressed in *Newbury Twp. Bd. of Twp. Trustees v. Lomak Petroleum*, 62 Ohio St.3d 387 (1992). The focus of the *Newbury* decision was the application of former R.C. 1509.39 which permitted local governments to enact and enforce health and safety standards for the drilling and exploration of oil and gas, provided that they are not less restrictive than existing state requirements. R.C. 1509.39 has since been repealed and there is no local health and safety ordinance in this case that would conflict with the permit issued by the chief.

{¶ 62} Nor is there any dispute that R.C. 1509.06 mandates certain safety measures as a condition precedent to obtaining a permit to mine oil and gas, including

---

[4] The trial court relied on *Norwood v. Horney*, 110 Ohio St.3d 353, 2006-Ohio-3799, which is a case involving the government appropriation of private property. The statutory scheme at issue in this case, however, does not involve a government appropriation of private property rights.

specific additional safety measures where the well is to be located in an "urbanized area." R.C. 1509.06(H)(1). Because safety issues are part of the permitting process under R.C. 1509.06, and because orders of the chief granting mining permits under R.C. 1509.06 are not appealable to the commission pursuant to R.C. 1509.36, the commission is without jurisdiction to consider such issues in the context of an appeal to the commission from an order of the chief granting a pooling application under R.C. 1509.27. *See Ashmus v. Div. of Resources Mgt.*, Division of Oil and Gas App. No. 797 (Nov. 19, 2008) (the commission has no jurisdiction, in the review of a mandatory pooling order, to consider the unwilling participant's legitimate concerns regarding the safety of siting a well in an urbanized area). *See also Chesapeake* at 208 (commission is patently and unambiguously without jurisdiction to consider an appeal from a decision of the chief granting a mining permit under R.C. 1509.06).

{¶ 63} In my view, the commission's order in this case opens the door for an unwilling participant to challenge a mandatory pooling application on the grounds that the applicant fails to offer lease terms that impose additional safety measures and assurance regarding regulatory compliance that may not be required or permitted under the Ohio Revised Code and the Ohio Administrative Code. It also opens the door for the commission to re-determine permitting issues that have been finally determined by the chief in the permitting process. Thus, I believe that the commission's ruling is inconsistent with the language used in R.C. 1509.27 and 1509.01(I) and incompatible with the comprehensive regulatory scheme of R.C. Chapter 1509. *Morrrison.*

{¶ 64} ODNR has recently promulgated Ohio Adm.Code 1501:9-2-02, effective July 16, 2015. The purpose of the rule is to amplify the provisions of R.C. 1509.03 as they pertain to horizontal well site construction. As a result, the Ohio Revised Code and the Ohio Administrative Code provide a comprehensive regulatory scheme for obtaining a permit to construct a horizontal well, including standards that address the safety of well drilling construction and operation, protection of the public and private water supply, fencing and screening of surface facilities, waste containment and disposal, sediment and erosion control plans, dust control, construction of access roads, and noise mitigation.

{¶ 65} Additionally, "R.C. Chapter 1509 provides a number of duties and prohibitions regarding the operation of oil and gas wells and sets forth a variety of

enforcement procedures and sanctions to ensure compliance * * * including injunctive relief (R.C. 1509.04), civil penalties (R.C. 1509.33), refusal to grant permits (R.C. 1509.08), and suspension orders (R.C. 1509.06)." *State v. Tipka*, 12 Ohio St.3d 258, 259 (1984). R.C. Chapter 1509 also imposes criminal sanctions for violators. *Id.*, citing R.C. 1509.99. Thus, the comprehensive statutory scheme of R.C. Chapter 1509 provides enforcement remedies and sanctions that address safety concerns, albeit not as part of the mandatory pooling application process. As such, the issue of mining safety and regulatory compliance are not before the chief in reviewing a mandatory pooling application to determine whether the applicant has made an offer that represents just and equitable compensation for the unwilling participant's correlative rights.

{¶ 66} Accordingly, I conclude that the common pleas court erred by finding that the commission's order was lawful and reasonable, and I would overrule appellant's second assignment of error and sustain appellant's first, third, and fourth assignments of error, reverse the judgment of the Franklin County Court of Common Pleas, and remand the case to the commission to reinstate the chief's mandatory pooling order.

_____