[Cite as *Ohio Dept. of Job & Family Servs. v. Delphi Automotive Sys., Inc.*, 2017-Ohio-809.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Ohio Department of Job and Family Services, | : | |
| | : | |
| Appellee-Appellant, | | No. 14AP-971 |
| | : | (C.P.C. No. 13CV-13451) |
| v. | | |
| | : | (REGULAR CALENDAR) |
| Delphi Automotive Systems, LLC, | | |
| | : | |
| Appellant-Appellee. | | |
| | : | |

D E C I S I O N

Rendered on March 7, 2017

**On Brief:** *Michael DeWine*, Attorney General, and *Eric A. Baum*, for appellant. **Argued:** *Eric A. Baum*.

**On Brief:** *Vorys, Sater, Seymour and Pease, LLP*, *Jonathan R. Vaughn*, and *Michael J. Ball*, for appellee. **Argued:** *Michael J. Ball*.

APPEAL from the Franklin County Court of Common Pleas

BRUNNER, J.

{¶ 1} Appellant before this Court and appellee before the Franklin County Court of Common Pleas, the Ohio Department of Job and Family Services ("ODJFS") appeals a decision of the Franklin County Court of Common Pleas entered on November 5, 2014 which reversed a decision of the Unemployment Compensation Review Commission ("UCRC"). We find the court of common pleas entered a judgment that contained legal error in impermissibly narrowing the plain meaning of the phrase "at the time of the transfer." Because the court of common pleas did so, it abused its discretion in considering whether the UCRC decision was in accordance with law and supported by reliable, probative, and substantial evidence and we reverse.

No. 14AP-971

## I.  FACTS AND PROCEDURAL HISTORY

{¶ 2}  In an agreement dated July 30, 2009, and signed on August 5, 2009, General Motors Company and Delphi Corporation, among other entities, entered into a "MASTER DISPOSITION AGREEMENT" with DIP HOLDCO, LLP[1] ("DIP") and other parties whereby DIP would acquire certain assets of Delphi Corporation. (Apr. 8, 2014 UCRC Admin. Records at 455-607.)  This agreement was part of a modified plan for reorganization of Delphi Corporation approved by the United States Bankruptcy Court for the Southern District of New York and had an effective date of October 6, 2009. *Id.* at 609-13, ¶ 3.

{¶ 3}  Insofar as this reorganization affected Ohio and the case at hand, a number of state unemployment compensation forms were completed showing the disposition of various component businesses of Delphi Corporation, specifically Delphi Automotive Systems Services LLC, Delphi Automotive Systems Human Resources LLC, and Delphi Diesel Systems Corporation (collectively "Old Delphi") transferred to a company which, for simplicity, we shall refer to as "New Delphi."[2,3] *Id.* at 438-42.  Among these forms was one which marked "yes" to the query, "Did you acquire a portion (less than 100%) of a trade or business from an employer with which your business has common ownership, management, or control?" *Id.* at 390, 442.  These forms were completed and signed on a variety of dates in Fall 2009. *See* i*d.* at 438-42.  On the effective date of the transaction, October 6, 2009, Delphi published a press release in which it asserted, "Rodney O'Neal [who became President and CEO of Delphi Corp. in 2007] will remain President and CEO and the current leadership will continue to manage the company's global operations." *Id.* at 396, 406.  A biography of Rodney O'Neal produced from New Delphi's investor relations page relates that O'Neal was Director of the Board since May 2011, "became

---

[1] The cover page of the MASTER DISPOSITION AGREEMENT lists "DIP HOLDCO 3, LLC" but other documents in the record suggest the proper name of this company was "DIP HOLDCO, LLP" before it was later changed to "DELPHI AUTOMOTIVE, LLP." (UCRC Admin. Records at 455, 621-22.)

[2] Corporate formation documents for this company list its official name as "New Delphi Automotive Systems 1, LLC." (UCRC Admin. Records at 615.)  However, New Delphi Automotive Systems 1, LLC changed its name to Delphi Automotive Systems, LLC effective at 12:01 AM on October 7, 2009. *Id.* at 617.  This entity is apparently a subsidiary of DELPHI AUTOMOTIVE LLP, a limited liability partnership organized under the laws of England and Wales and formerly known as DIP HOLDCO, LLP. *Id.* at 621-22.

[3] When we refer to the appellee in this lawsuit or when there is no reason or basis on which to distinguish between eras of Delphi, we shall simply refer to the company as "Delphi."

No. 14AP-971

President and Chief Executive Officer of [New Delphi] effective October 6, 2009," and served as Old Delphi's President and CEO since January 2007. *Id.* at 406.

{¶ 4} On June 20 and July 6, 2011, based on the common management or control of Old Delphi and New Delphi, the UCRC issued rate determination decisions that accorded Old Delphi's higher tax rate (rather than the lower rate for new companies) to New Delphi for the years 2009-2011. *Id.* at 10, 12-24. On July 19, 2011, Delphi sought reconsideration of the rate adjustments for 2009 and 2010. *Id.* at 5-9. The letter seeking reconsideration maintained that the forms admitting common ownership, management, or control were erroneous. *Id.* at 6. The letter represented that New Delphi was incorporated in Delaware on August 21, 2009. *Id.* at 5. It also represented that at the time of the transfer of assets from Old Delphi to New Delphi, the officers of the new company were David Miller and Jeff Fortizzi. *Id.* The directors and corporate officers of Old Delphi, the letter claimed, departed on October 6, 2009 and "[u]pon new board member approval, the corporate officers of New Delphi were appointed."[4] *Id.*

{¶ 5} A designee of the director of ODFJS denied the request for reconsideration in a decision mailed on September 7, 2012 based on the finding of common management and control. *Id.* at 11. By letter dated October 4, 2012, Delphi sought an administrative hearing on the matter. *Id.* at 30-32. Delphi again indicated that the admission of common ownership, management, or control was an error but this time asserted that in the period immediately after the October 6 effective date of the transaction but before the "new board" approved "the corporate officers of New Delphi," David Miller and Michael Gatto were in control of New Delphi as its officers. *Id.* at 5, 31.

{¶ 6} On November 6, 2013, the UCRC held a hearing. *Id.* at 345-84. At the hearing, both sides agreed that the rate determination was based on R.C. 4141.24(G)(1) and that the hearing would, therefore, be limited to that topic. *Id.* at 350-51. ODJFS presented no witnesses, relying instead on its exhibits. *Id.* at 348-49. Delphi presented one witness, Mark Rozycki, who was (at the time of the hearing) the Director of Tax

---

[4] The letter did not disclose that these "corporate officers of New Delphi" were the same people serving in the same positions they had held when working for Old Delphi or that they were employed and paid by New Delphi as executives in the period between the effective transaction date (October 6) and their official appointment on October 23, 2009. (UCRC Admin. Records at 354-55, 371-72.) (Testimony of Mark Rozycki, Director of Tax Administration for Delphi Automotive Systems, LLC.)

No. 14AP-971

Administration for New Delphi and had been employed in that capacity since October 6, 2009. *Id.* at 352.

{¶ 7} Rozycki testified that Old Delphi did not sell or transfer all of its trade or business, just certain assets. *Id.* at 362-64. In addition, not all employees transferred from Old Delphi to New Delphi; 882 of the original 1,266 persons employed by Old Delphi were retained by New Delphi. *Id.* at 364. However, Rozycki acknowledged that the October 6, 2009 press release stated that the executive control of Old Delphi would continue to New Delphi. *Id.* at 371-72, 396-97. In addition, he confirmed that each of the executive officers of Old Delphi held the same positions in New Delphi after the transaction was complete. *Id.* at 354-55. Specifically, he testified that although the executives of Old Delphi were not formally appointed by the new board until October 23, 2009 (over two weeks after the October 6 effective date), they were paid in the interim and carried out their duties as corporate officers. *Id.* at 372-73. These officers acted in their paid capacities but were claimed to be not "officially" in control. *Id.* Official sign-off had to be completed, during the 17-day pre-appointment period, by Miller and Gatto. *Id.* at 373. Rozycki was not aware of the details of company ownership in terms of stock holdings or options, but he testified that he did not believe ownership was common between Old Delphi (which was publicly traded) and New Delphi (which was owned by two hedge funds). *Id.* at 360, 366-67, 369, 373. He also testified that the board members of Old Delphi and New Delphi were different persons. *Id.* at 369.

{¶ 8} Following the hearing, in a decision mailed on November 13, 2013, the UCRC affirmed the rate determination subjecting New Delphi to the higher tax rate inherited from Old Delphi rather than the lower rate for new companies. (Nov. 13, 2013 UCRC Decision, filed in the Franklin County Court of Common Pleas on December 13, 2013.) In the decision, the UCRC stated findings of fact in relevant part as follows:

> On October 6, 2009, assets that were previously held by [Old Delphi] were transferred to [New Delphi] through a bankruptcy reorganization. Approximately 67% of the employees who were previously employed by [Old Delphi] became employees of [New Delphi]. Some assets were excluded from the transfer. [New Delphi] did not receive all or substantially all of the assets that were previously held by [Old Delphi].

> Immediately upon the transfer of the assets, [New Delphi] was owned and controlled by Silver Point Capital L.P. and Elliot Associates, L.P., which were two senior creditors of the business. However, [New Delphi] was managed by the same individuals who managed [Old Delphi]. The President, Treasurer, General Counsel and Secretary, and others in high-level management positions, remained the same. * * *[5] In a press release issued on October 6, 2009, Delphi stated, "Rodney O'Neal will remain President and CEO and the current leadership will continue to manage the company's global operations."

(UCRC Decision at 4.)

{¶ 9} The UCRC then reasoned:

> [New Delphi] can be deemed a successor in interest [] if a portion of the business of [Old Delphi] was transferred to [New Delphi], and [New Delphi] was under substantially common ownership, management, or control as [Old Delphi].
>
> * * * The Review Commission finds that [New Delphi] was an employer at the time of the transfer as 67% of the employees were transferred to [New Delphi]. Further, Section 4141-17-01(C) of the Ohio Administrative Code defines "successor in interest" to include any person or employer as defined by Section 4141.01(A)(1) of the Ohio Revised Code that is or becomes an employer and that acquires a trade or business under Rules 4141-17-02 to 4141-17-05 of the Ohio Administrative Code. Even assuming that [New Delphi] was not an employer at the time of the transfer, it subsequently became an employer soon after the transfer. * * *
>
> * * * [U]nder Section 4141.24(G)(1) of the Ohio Revised Code, the transferee assumes the unemployment experience attributable to the transferred trade or business if, at the time of transfer, both "employers" are under substantially common ownership, management, or control. In this case, [New Delphi] was, at the time of the transfer, under substantially

---

[5] The UCRC decision also included fact findings the bases for which are unclear:

> The Treasurer retained the authority to sign checks, drafts or other orders for the payment of money and therefore continued to have the authority to obligate the funds of the business, and the Treasurer also retained the authority to endorse or assign negotiable instruments, bonds, stocks certificates, and other securities. The same individuals who served on the Board of Directors prior to the transfer continued to serve on the Board of Directors at the time of the transfer. Members of the new Board of Directors were not elected until October 23, 2009, which was seventeen days after the transfer.

(UCRC Decision at 4.)

the same management as the transferred business. Individuals in key management positions, such as the President, Treasurer, and General Counsel and Secretary, continued to manage [New Delphi]. On October 6, 2009, Delphi issued a media release which stated that "Rodney O'Neal will remain President and CEO and the current leadership will continue to manage the company's global operations." Therefore, based on the evidence presented in this case, the Review Commission finds that [New Delphi] was under substantially common management as [Old Delphi] as of October 6, 2009, which was the date of the transfer. In addition, the Review Commission finds that [New Delphi] acquired a portion of the trade or business of [Old Delphi].

(Decision at 5-6.)

{¶ 10} On December 13, 2013, Delphi appealed the decision to the Franklin County Court of Common Pleas. Both parties to the administrative appeal submitted briefing, and, on November 5, 2014, the common pleas court issued a decision reversing the finding of the UCRC. (Nov. 5, 2014 Common Pleas Decision.) The common pleas court noted that the UCRC decision "was based upon the Commission's conclusions that (i) Old Delphi and New Delphi were under substantially common management at the time of the transfer and (ii) New Delphi was an employer at the time of the transfer of a portion of Old Delphi's trade and/or business to New Delphi on October 6, 2009." (Com. Pl. Decision at 1.) The common pleas court concluded that the phrase "at the time of transfer" is limited to the exact moment of transfer, neither pre-transfer nor post-transfer. *Id.* at 10. Having narrowly interpreted the field of inquiry, the common pleas court stated "there is no evidence in the record that prior to or at the time of the transfer there was any common, let alone substantial, ownership, management or control of Old and New Delphi." *Id.* at 8; *see also id.* at 4, 10-11. It also concluded, "[t]here is no evidence in the record that New Delphi was an employer, as defined by R.C. 4141.01(A)(1) and used in R.C. 4141.24(G), at the time of the transfer." *Id.* at 11; *see also id.* at 4.

{¶ 11} ODJFS now appeals.

## II. ASSIGNMENT OF ERROR

{¶ 12} ODJFS assigns a single error for our review:

As the Review Commission found, Old Delphi funneled certain of its assets to a hedge fund, only to reroute them to New Delphi 17 days later. But because the same management

> team made executive decisions throughout the process, the trial court improperly made factual findings, and thus abused its discretion, in determining that New Delphi was not an "employer" and did not have common ownership, management, and control of the business at the time of the transfer.

## III. STANDARD OF REVIEW

{¶ 13} R.C. 4141.26 instructs that the court of common pleas, when reviewing a decision of the UCRC:

> [M]ay affirm the determination or order complained of in the appeal if it finds, upon consideration of the entire record, that the determination or order is supported by reliable, probative, and substantial evidence and is in accordance with law. In the absence of such a finding, it may reverse, vacate, or modify the determination or order or make such other ruling as is supported by reliable, probative, and substantial evidence and is in accordance with law.

R.C. 4141.26(D)(2).

{¶ 14} "Our standard of review is narrower than the trial court's. As to factual issues, our review is limited to a determination as to whether the trial court abused its discretion." *Miracle Home Health Care, LLC v. Ohio Dept. of Job & Family Servs.*, 10th Dist. No. 12AP-318, 2012-Ohio-5669, ¶ 18 (citing numerous cases). "Although an abuse of discretion is typically defined as an unreasonable, arbitrary, or unconscionable decision, no court has the authority, within its discretion, to commit an error of law." *State v. Jones*, 10th Dist. No. 15AP-596, 2016-Ohio-4766, ¶ 15, citing *State v. Moncrief*, 10th Dist. No. 13AP-391, 2013-Ohio-4571, ¶ 7. Thus we review the court of common pleas' decision for abuse of discretion except as to questions of law, which are reviewed de novo.

## IV. DISCUSSION

### A. Meaning of "at the Time of the Transfer"

{¶ 15} R.C. 4141.24(G)(1) provides that unemployment experience for rate determination purposes is transferred from an original company to a successor under the following circumstances:

> If an employer transfers its trade or business, or a portion thereof, to another employer and, at the time of the transfer, both employers are under substantially common ownership, management, or control, then the unemployment experience

> attributable to the transferred trade or business, or portion thereof, shall be transferred to the employer to whom the business is so transferred.

{¶ 16} The parties have not cited, nor have we found, any case, statute, or rule in Ohio that has construed the phrase "at the time of the transfer." If this phrase is clear, as the common pleas court held, then it must simply be applied, not construed. *Columbia Gas Transm. Corp. v. Levin*, 117 Ohio St.3d 122, 2008-Ohio-511, ¶ 19. "The first rule of statutory construction is to look at the statute's language to determine its meaning. If the statute conveys a clear, unequivocal, and definite meaning, interpretation comes to an end, and the statute must be applied according to its terms." *Id.* If, however, there is some ambiguity or room for interpretation in the phrase, then we must read the statute with the instructions provided by the legislature. *See* R.C. 1.41 (instructing that sections "1.41 to 1.59, inclusive, of the Revised Code apply to all statutes * * * and to rules adopted under them"). As pertinent here, the legislature has instructed readers of statutes to presume that "[t]he entire statute is intended to be effective," and that "a just and reasonable result is intended." R.C. 1.47(B) and (C). In either case, however, we must first consider what the phrase "at the time" means.

{¶ 17} The *Oxford English Dictionary* contains a definition of the phrase "at the time" under its entry for "time." "A particular period indicated or characterized in some way, either explicitly (usu. with *of*) or by anaphoric reference (as ***at the time***, etc.)." (Emphasis added.) *Oxford English Dictionary* (OED online Ed. Sept. 2016) (found within the definition of "time" at A.I.2.a.). Rather than use this definition (or any published definition or source), the common pleas court stated that the phrase "at the time of the transfer" is literally a temporal determination—when the stated time of transfer occurs as set forth by effective date. The court of common pleas concluded that because there was no evidence that Old Delphi and New Delphi both employed the same officers at a singular point in time, that is, at single instant of legal transfer, reversal was required.

{¶ 18} This is not correct. The Supreme Court of Ohio has recognized (albeit in a different context) that transfers of business assets between corporations can take more than a mere instant. *In re Lord Baltimore Press, Inc.*, 4 Ohio St.2d 68, 74 (1965) (recognizing that "the transfer of employees from the payroll of the predecessor to the payroll of the successor does not have to occur at an instantaneous point of time"). We

No. 14AP-971

have upheld imposition of a prior rate to a successor under R.C. 4141.24(G)(1) on the grounds of common management where executives transferred from an old company to a new company even though they were never simultaneously employed by both companies during the transaction. *Senco Brands, Inc. v. Ohio Dept. of Job & Family Servs.*, 10th Dist. No. 15AP-796, 2016-Ohio-4769. The appropriate understanding of the phrase "at the time of the transfer" is the "period" of the transfer (by which acts necessary to complete the transfer), not just an arbitrarily determined singular date that is perhaps set forth as a legal effective date in company or asset transfer documents. Applying this legal principle to a common sense and perhaps more easily understandable situation, "the time of the American Revolution" encompasses all the events of the American Revolution, not only the moment the last signature dried on the Declaration of Independence.

{¶ 19} The common pleas court's interpretation of the phrase subjects R.C. 4141.24(G)(1) to requiring "common" ownership, management, or control of both predecessor and successor at the exact legal instant of transfer. Such an interpretation would only apply where, for example, officers are employed by both predecessor and successor companies simultaneously. In the case of a merger or of a business asset transfer, the term "transfer" means to move from one place to another, which encompasses the process of moving—that is, the transportation itself. *Oxford English Dictionary*. Despite the existence of a third party through which the transfer occurred, the transfer was nonetheless a process. That it was a multi-stage process does not permit an interpretation that resists implementing R.C. 4141.24(G)(1) with concordant responsibility of the successor for the unemployment compensation rate of the predecessor. Companies may not adjust their unemployment tax rates by creating an empty shell company (which employs no one and is managed, owned, and controlled by a straw holder) to be an interim recipient of its assets, absent a bona fide basis that supplies finality to an interim transfer.

{¶ 20} More compelling, assets and employees that are transferred to a shell company and do not rest there but are subject to further transfer do not lose their significance for the final successive recipient of the transfer. This is because "transfer," according to its definition, is a process, not simply a blip in time. We hold that "transfer" was improperly interpreted and applied by the trial court. We also hold that the common

No. 14AP-971

pleas court's interpretation of "at the time of the transfer" fails R.C. 1.47's command that statutes be presumed effective and reasonable, and is in error as a matter of law. R.C. 1.47(B) and (C).

**B. Whether the Conclusion that New Delphi and Old Delphi were Under Common Management was Supported by Reliable, Probative, and Substantial Evidence**

{¶ 21} The court of common pleas, using its erroneous interpretation of "at the time of transfer," found "no evidence" that New Delphi and Old Delphi had common management. (Common Pleas Decision at 8.) However, a great deal of evidence was presented to the common pleas court that supported a factual finding under the appropriate interpretation of R.C. 4141.24(G)(1) that New Delphi and Old Delphi had common management.

{¶ 22} In forms filed with ODJFS in Fall 2009, New Delphi admitted that it shared common ownership, management, or control with Old Delphi. (UCRC Admin. Records at 390, 442.) On October 6, 2009, Delphi asserted in a press release that, "Rodney O'Neal [who became President and CEO of Delphi Corp. in 2007] will remain President and CEO and the current leadership will continue to manage the company's global operations." *Id.* at 396, 406. Not until after ODJFS made use of the admission to attribute Old Delphi's higher tax rates to New Delphi did Delphi assert that the common management admission was a clerical mistake. *Id.* at 6.

{¶ 23} And even after asserting a purported mistake, Delphi offered confusing accounts of whom, in fact, managed and controlled New Delphi at the time of the transfer. In one letter, it was Miller and Fortizzi who were officers (while Miller and Gatto were owners); in another, it was Miller and Gatto who were officers. *Compare* i*d.* at 5 *and* 31. Also, in testimony at the November 6, 2013 hearing, Delphi's witness did not dispute the accuracy of the October 6, 2009 press release that asserted common management. *Id.* at 372. A biography of Rodney O'Neal produced from New Delphi's investor relations page less than two weeks prior to the November 6th hearing indicated that O'Neal was Director of the Board since May 2011, "became President and Chief Executive Officer of New Delphi effective October 6, 2009," and served as Old Delphi's President and CEO since January 2007. *Id.* at 406. Despite these public statements, one letter challenging the rate determinations asserted that the directors and corporate officers of Old Delphi departed

No. 14AP-971

on October 6, 2009 and suggested no new officers were appointed until later when "[u]pon new board member approval, the corporate officers of New Delphi were appointed." *Id.* at 5. The letter omitted mention that the "corporate officers of New Delphi" appointed by "new board member approval," were the same people serving in the same positions they had held when working for Old Delphi and that they were paid in the interim during the transfer through the shell company by New Delphi before their official appointment on October 23, 2009. *Id.* at 5, 354-55, 371-73.

{¶ 24} In the oral hearing, Delphi's own witness testified that each of the executive officers of Old Delphi held the same positions in New Delphi after the transaction was complete. *Id.* at 354-55. Specifically, he testified that although the executives of Old Delphi were not formally appointed by the new board until October 23, 2009 (over two weeks after the October 6 effective date), they were paid in the interim and carried out their duties as corporate officers:

> Q: Okay so Mr. Rozycki according to your understanding then all of the officers moved over from the old company but you have no idea what position they were working in.
>
> A: Other than executive uh as stated in Rodney's uh I don't think a, a position was specified.
>
> Q: Alright and um do you have any reason to believe that this press release is false?
>
> A: No I believe they may have been acting in those positions but they weren't actually elected to those positions as of that date.
>
> Q: Okay so they may have been carrying out the duties of uh um corporate officers but perhaps were not officially so.
>
> A: That, yes that's my understanding.

*Id.* at 372; *see also id* at 373.

{¶ 25} Delphi frequently indicated to the public, investors, and (at least initially) ODJFS that management was common between Old Delphi and New Delphi, and Delphi only made assertions to the contrary when it began to appear that the fact of common management had negative tax consequences. The UCRC was free to conclude from the evidence which of Delphi's assertions about the state of its management were more

No. 14AP-971

truthful. Thus the UCRC factfinding that "[New Delphi] was managed by the same individuals who managed [Old Delphi]," was supported by reliable, probative, and substantial evidence. (UCRC Decision at 4.) It was only by an error of law in construing the phrase "at the time of the transfer" that the common pleas court was able to conclude that there was "no evidence" of common management. (Common Pleas Decision at 4, 8, 10-11.) Thus, the common pleas court abused its discretion.

### C. Whether the Conclusion that New Delphi was an Employer was Supported by Reliable, Probative, and Substantial Evidence

{¶ 26} R.C. 4141.24(G)(1) only applies, by its plain terms, when both transferor and transferee are "employers." The common pleas court found, in reversing the UCRC determination, that there was no evidence that New Delphi was an employer at the time of the transfer. (Common Pleas Decision at 4, 11.) Consistent with "at the time of the transfer" encompassing a period of transfer, rather than the final moment of the process of a transfer (as designated by an arbitrary effective date), we disagree with the common pleas court's conclusion.

{¶ 27} The definition of "employer" is set forth by statute in relevant part as follows:

> "Employer" means * * * any individual or type of organization including any * * * limited liability company, * * * whether domestic or foreign, * * * who subsequent to December 31, 1971* * *:
>
> (a) Had in employment at least one individual, or in the case of a nonprofit organization, subsequent to December 31, 1973, had not less than four individuals in employment for some portion of a day in each of twenty different calendar weeks, in either the current or the preceding calendar year whether or not the same individual was in employment in each such day; or
>
> (b) Except for a nonprofit organization, had paid for service in employment wages of fifteen hundred dollars or more in any calendar quarter in either the current or preceding calendar year; or
>
> * * *
>
> (e) Is not otherwise an employer as defined under division (A)(1)(a) or (b) of this section; and

> **(i)** For which, within either the current or preceding calendar year, service * * * is or was performed with respect to which such employer is liable for any federal tax against which credit may be taken for contributions required to be paid into a state unemployment fund.

R.C. 4141.01(A)(1)(a), (b), and (e)(i).

> "Employment" means service performed by an individual for remuneration under any contract of hire, written or oral, express or implied, including service performed in interstate commerce and service performed by an officer of a corporation, without regard to whether such service is executive, managerial, or manual in nature, and without regard to whether such officer is a stockholder or a member of the board of directors of the corporation.

R.C. 4141.01(B)(1).

{¶ 28} Delphi's own witness, Rozycki, testified during the November 2013 hearing that he was the Director of Tax Administration for New Delphi and had been employed in that capacity since October 6, 2009 (the effective date of the transfer). (UCRC Admin. Records at 352.) Rozycki also testified that Miller and Gatto, both members of New Delphi, served as officers of New Delphi and were in control at the time of the transfer. *Id.* at 373. He also testified that the officers of Old Delphi were employed by New Delphi immediately following the October 6, 2009 effective date, performed duties as officers and executives (albeit not having been officially appointed yet), and were paid for their performance. *Id.* at 372-73. Again, the Delphi press release from October 6, 2009 plainly indicated "Rodney O'Neal will remain President and CEO and the current leadership will continue to manage the company's global operations," and a biography of Rodney O'Neal produced shortly prior to the hearing confirmed that O'Neal "became President and Chief Executive Officer of [New Delphi] effective October 6, 2009." *Id.* at 396, 406.

{¶ 29} While wage and tax data for Delphi was not presented at the hearing, the burden was on New Delphi to show that it was entitled to an exemption from the inherited tax experience from Old Delphi. *McConnell v. Ohio Bur. of Emp. Servs.*, 10th Dist. No. 95APE03-262 (Oct. 5, 1995), citing *Loctite Corp. v. Tracy*, 71 Ohio St.3d 401, 402 (1994) ("One claiming an exemption from a taxing statute bears the burden of proving a right to it."). The evidence that supported New Delphi's tax rate inheritance

No. 14AP-971

from Old Delphi along with the absence of evidence that would support a waiver leaves New Delphi in the position of being an employer that inherits the previous employer's tax rate. New Delphi "[h]ad in employment at least one individual" and employed and paid wages to a team of executives for more than two weeks during the transfer period in amounts sufficient for federal employment tax liability. R.C. 4141.01(A)(1)(a), (b), and (e). New Delphi failed to meet its burden to show exemption on these facts, and, thus, UCRC factfinding that New Delphi was an employer was supported by reliable, probative, and substantial evidence.

{¶ 30} Delphi argues that "Ohio Rev. Code § 4141.01(A)(1) defines 'employer' as any person or organization that, in either the current or the preceding calendar year: (i) employed at least one individual for some portion of a day in each of twenty different calendar weeks." (Delphi Brief at 21, fn. 6.) Because there was not evidence of employment in the duration of 20 different weeks, Delphi argues that the common pleas court's reversal should be affirmed. There are two problems with this argument.

{¶ 31} The first problem is evidentiary in nature. If New Delphi indeed employed no one, it had the burden to present some evidence supporting that assertion. *McConnell*, citing *Loctite Corp.* at 402. It did not do so. Delphi's witness only tentatively testified that he was not aware of having employees in Ohio at the time of the transfer:

> Q: Okay was [New Delphi] an employer at the time that it acquired select assets of old Delphi?
>
> A: I believe it, it was not um however we do not form that entity and other than Gato[sic] and Miller I have no id[sic], I, I don't know of anybody else who worked for that company.
>
> Q: Okay so you're not aware of having any employees in the state of Ohio.
>
> A: Right.

(Admin. Records at 365.)

{¶ 32} The second problem lies in legal statutory interpretation. The present version of R.C. 4141.01(A)(1)(a) defines "employer" as an organization that:

> Had in employment at least one individual, or in the case of a nonprofit organization, subsequent to December 31, 1973, had not less than four individuals in employment for some portion

> of a day in each of twenty different calendar weeks, in either the current or the preceding calendar year whether or not the same individual was in employment in each such day.

As drafted, the statute applies the limitation, "had not less than four individuals in employment for some portion of a day in each of twenty different calendar weeks, in either the current or the preceding calendar year whether or not the same individual was in employment in each such day," only to "a nonprofit organization." *Id.* For-profit organizations are employers under the statute if they "[h]ad in employment at least one individual," with no specification of how many weeks they had an employee. *Id.* This Court has previously noted that "[t]he definition of 'employer' includes individuals who 'ha[ve] in employment at least one individual.' " *Evans v. Dir., Ohio Dept. of Job & Family Servs.*, 10th Dist. No. 14AP-743, 2015-Ohio-3842, ¶ 14. Delphi's interpretation that even the "one individual" employed by a for-profit company must have been employed "for some portion of a day in each of twenty different calendar weeks," in order for a company to be counted as an employer is misplaced. (Delphi Brief at 21, fn. 6.)

{¶ 33} We are supported in this view by a review of statutory history. Prior to a revision effective on January 6, 1974, R.C. 4141.01(A)(1)(a) read as follows:

> Had in employment at least one individual for some portion of a day in each of twenty different calendar weeks, in either the current or the preceding calendar year whether or not the same individual was in employment in each such day.

Am.Sub.S.B. No. 52, 135 Ohio Laws, Part I, 201. This former version of the statute, were it still in use, would support Delphi's interpretation. But the 1974 revision added the underlined text:

> Had in employment at least one individual, or in the case of a nonprofit organization, subsequent to December 31, 1973, had not less than four individuals in employment for some portion of a day in each of twenty different calendar weeks, in either the current or the preceding calendar year whether or not the same individual was in employment in each such day.

(Emphasis added.) *Id.* Because of the addition of the comma after "one individual" and the failure to include a comma after "individuals in employment," the plain grammatical reading of the statute after the 1974 amendment is that the first clause ("[h]ad in

employment at least one individual") now stands on its own and is not restricted by the remainder.

{¶ 34} Other than our statement in *Evans* that "[t]he definition of 'employer' includes individuals who 'ha[ve] in employment at least one individual,' " no court has squarely addressed the argument posed by Delphi and no other express language in Amended Substitute Senate Bill 52 exists as a statement of legislative intent to instruct us otherwise. *See Evans* at ¶ 14; Am.Sub.S.B. No. 52, 135 Ohio Laws, Part I, 201, et seq. Thus, we must interpret the statute as it exists now by its plain grammatical meaning. *See* R.C. 1.41 (instructing that sections "1.41 to 1.59, inclusive, of the Revised Code apply to all statutes * * * and to rules adopted under them"; R.C. 1.47(B) and (C) (instructing readers that "[t]he entire statute is intended to be effective," and "a just and reasonable result is intended"); *Levin* at ¶ 19. We, therefore, reject Delphi's interpretation and hold that an employer, as the law currently stands, includes any organization (except a non-profit) that "subsequent to December 31, 1971 * * * [h]ad in employment at least one individual."[6] R.C. 4141.01(A)(1)(a).

{¶ 35} ODJFS' sole assignment of error is sustained.

## V. CONCLUSION

{¶ 36} The Franklin County Court of Common Pleas erred as a matter of law in interpreting and applying the phrase "at the time of the transfer." As a result, it erroneously reached the conclusion that simultaneous employment of officers was necessary to show common management at an instant of transfer determined by a contractual effective date. Reliable, probative, and substantial evidence in the record showed that New Delphi was an employer and shared common ownership with Old Delphi "at the time of the transfer" as plainly and reasonably interpreted to encompass the period during which acts necessary to the transfer occurred. Accordingly, we find that the Franklin County Court of Common Pleas abused its discretion in reversing the decision of the UCRC when it erred as matter of law.

*Judgment reversed.*

TYACK, P.J., and DORRIAN, J., concur.

_____

[6] We note, however, that "in the case of political subdivisions or their instrumentalities," this definition applies only "subsequent to December 31, 1973." R.C. 4141.01(A)(1).