[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Delphi Automotive Sys., L.L.C. v. Ohio Dept. of Job & Family Servs.*, Slip Opinion No. 2020-Ohio-2793.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2020-OHIO-2793

DELPHI AUTOMOTIVE SYSTEMS, L.L.C., APPELLANT, *v.* DIR., OHIO DEPARTMENT OF JOB AND FAMILY SERVICES, APPELLEE.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Delphi Automotive Sys., L.L.C. v. Ohio Dept. of Job & Family Servs.*, Slip Opinion No. 2020-Ohio-2793.]

*Unemployment-contribution rate—The language in R.C. 4141.24(G)(1) requires concurrent ownership, management, or control of both employers at the time that the business or trade is transferred—Court of appeals' judgment reversed and trial court's judgment reinstated.*

(No. 2017-0553—Submitted January 29, 2020—Decided May 7, 2020.)

APPEAL from the Court of Appeals for Franklin County,

No. 14AP-971, 2017-Ohio-809.

_____

**DEWINE, J.**

{¶ 1} This case deals with the transfer of a business and the manner in which the new business's "unemployment tax" will be calculated. Ohio employers pay

an "unemployment tax" to support the state's workers' compensation system; this tax is partly based upon an employer's "experience rating," which is derived from the amount of unemployment benefits that have been paid to the employer's former employees. The question in this case is whether the new business will receive the prior business's "experience rating."

{¶ 2} For the answer, we look to a statute that mandates that a new employer will receive the prior employer's experience rating if "at the time of the transfer, both employers are under substantially common ownership, management, or control." R.C. 4141.24(G)(1). Here, the new employer did not share common ownership, management, or control with the old employer on the date of the transfer, but it did hire the old employer's management team not long thereafter. The court of appeals concluded that the new employer would receive the prior employer's experience rating. It reached this result by construing the phrase "at the time of the transfer" broadly to include a multiweek-transition period during which various aspects of the business were shifted from the old employer to the new employer.

{¶ 3} We disagree. Under a plain reading of the statute, "at the time of the transfer" refers to the discrete point in time at which the legal transfer or acquisition occurs. Because both employers were not under substantially the same ownership, management, or control at the point in time at which the transfer occurred, the new employer is not subject to the prior employer's experience rating. We reverse the judgment of the court of appeals.

**The statutory scheme**

{¶ 4} Ohio employers are required to pay into the state's unemployment-compensation fund. *See* R.C. 4141.09; *see also* R.C. 4141.23 and 4141.01(L). The director of job and family services maintains a separate account for each employer's contributions and determines the rate at which the employer must make payments into that account. R.C. 4141.24 and 4141.25. The employer receives a credit

against its federal unemployment-tax liability for its state payments. 26 U.S.C. 3302(a).

{¶ 5} An employer's annual unemployment-contribution rate is based in part on the amount of unemployment-compensation benefits paid to its former employees; this is referred to as an experience rating. R.C. 4141.25(A). Employers who lay off high numbers of employees will therefore typically have a higher experience rating and pay higher taxes into the unemployment fund. *See* Kearns, *State Implementation of the SUTA Dumping Prevention Act of 2004*, 11 The State and Local Tax Lawyer, 105, 109 (2006). Employers who do not have sufficient experience on which to base their tax rate are assigned a standard new-employer rate. R.C. 4141.25(A).

{¶ 6} In the past, a tax-evasion practice emerged in which some employers artificially reduced their experience rating by shifting their employees to a new or different corporate entity. This practice became known as State Unemployment Tax Act ("SUTA") dumping. These dumping schemes typically involved transferring payroll to a newly formed corporation subject to the new-employer tax rate or to a shell company that had earned a more favorable experience rating. *See* Kearns, *State Implementation of the SUTA Dumping Prevention Act of 2004* at 111. For instance, an employer might escape its poor experience rating and the resulting higher tax rate by setting up a shell company, operating the shell company for several years with low turnover so that it can earn a good experience rating, and then transferring payroll to the shell company to take advantage of the lower tax rate. *SUTA Dumping Prevention Act of 2004: Hearing Before the Subcommittee on Human Resources of the House Committee on Ways and Means*, 109th Cong. 1st Sess. (2005) (testimony of Mason Bishop, United States Dept. of Labor).

{¶ 7} In 2004, Congress passed legislation in an attempt to curb the problem. SUTA Dumping Prevention Act of 2004, Pub.L. No. 108-295, 118 Stat. 1090 (2004). Specifically, the SUTA Dumping Prevention Act required states to

ensure that when an employer transfers a portion of its trade or business to another employer and both employers are under the same ownership and management, the acquiring employer inherits the business's experience rating along with its assets. *See* 42 U.S.C. 503(k)(1).

{¶ 8} The General Assembly amended Ohio's unemployment-compensation statutes to bring them into compliance with the new federal SUTA-dumping law. 2005 Am.S.B. No. 81, 151 Ohio Laws Part I, 171, 198-199. In so doing, it enacted the statute that is at issue in this case, R.C. 4141.24(G)(1) ("the mandatory-transfer provision"). That provision provides that an entity that qualifies as an "employer" under the statute will take a prior employer's experience rating if "at the time of the transfer, both employers are under substantially common ownership, management, or control."

**The transfer of assets from Old Delphi to New Delphi**

{¶ 9} The business transfer here arose from the 2005 bankruptcy of the Delphi Corporation, a multinational automotive-parts manufacturer. As part of the reorganization plan, two hedge funds, Elliot Associates, L.P., and Silver Point Capital, L.P. ("the hedge funds"), worked out a deal to acquire certain assets of Delphi Corporation from one of Delphi Corporation's subsidiaries, Delphi Automotive Systems Services, L.L.C. ("Old Delphi"), which had operations in Ohio. The hedge funds set up a new entity, Delphi Automotive Systems, L.L.C. ("New Delphi"), to facilitate the transaction. On October 6, 2009, a portion of Old Delphi's Ohio assets were transferred to New Delphi.

{¶ 10} In June 2011, the Ohio Department of Job and Family Services ("the state"), notified New Delphi that it would be assigned Old Delphi's experience rating for the years 2009 through 2011 under the mandatory-transfer provision. After unsuccessfully asking the state to reconsider its decision, New Delphi requested a hearing before the Ohio Unemployment Compensation Review

Commission ("the commission"). Mark Rozycki, New Delphi's director of tax administration, was the only witness at the hearing.

{¶ 11} Rozycki testified that prior to the October 6, 2009 asset transfer, New Delphi did not have any employees in Ohio, and Old Delphi and New Delphi did not share any common ownership, management, or control. Old Delphi was still a wholly owned subsidiary of Delphi Corporation, while New Delphi was owned, managed, and controlled entirely by the hedge funds. As of October 6, no one in charge of New Delphi had ever had any management authority at Old Delphi, and vice versa.

{¶ 12} From the date of the transfer on October 6 until October 23, New Delphi was under the control of representatives of the two hedge funds. New Delphi named a board of directors that did not include any former directors of Old Delphi. On the date of the transfer, New Delphi had issued a press release declaring, "[Old Delphi's] President and CEO and the current leadership will continue to manage the company's global operations." New Delphi did not, however, hire Old Delphi's leadership team at that time. Rather, New Delphi made offers of employment for the executives to accept or reject. During this transition period, these executives assumed some responsibilities at New Delphi and were paid for their services, but all operational decisions had to be approved by the hedge-fund representatives. On October 23, New Delphi's board officially hired Old Delphi's president and chief-executive officer, treasurer, general counsel, and secretary to positions similar to those they had at Old Delphi. At that point, the hedge-fund representatives relinquished control of New Delphi. In all, New Delphi hired roughly two-thirds of Old Delphi's Ohio employees.

{¶ 13} New Delphi contended that it was not subject to Old Delphi's experience rating because, at the time of the transfer, it was neither an "employer" as defined by the statute nor did it share "substantially common ownership,

management, or control" with Old Delphi. The commission disagreed and upheld the decision to assign Old Delphi's experience rating to New Delphi.

{¶ 14} New Delphi appealed to the Franklin County Court of Common Pleas. The state defended the commission's decision, asserting that although Old Delphi's management executives were not formally hired by New Delphi until 17 days after the transfer of the assets, they began working for New Delphi in substantially the same roles immediately following the transfer. The state further argued that even if there was "technically a break in ownership, management, or control" during that interim period, the mandatory-transfer provision applied because Old Delphi's executives took control of New Delphi as of October 23, 2009.

{¶ 15} The common pleas court reversed the commission. The court determined that although New Delphi ultimately took on the same management structure as Old Delphi, there was no evidence showing that the companies were under substantially the same ownership, management, or control at the time of the transfer on October 6. The court explained that the statutory phrase "at the time of the transfer" meant "at the time of the actual transfer," not pretransfer or post-transfer. The court further concluded that New Delphi did not succeed to Old Delphi's experience rating for an additional reason: New Delphi did not have any Ohio employees until after the asset transfer had occurred and thus could not have met the statute's definition of "employer" at the time of the transfer. *See* R.C. 4141.01(A)(1)(a).

{¶ 16} This time the state appealed, and the Tenth District reversed, concluding that the common pleas court improperly constricted the meaning of "at the time of the transfer" to the "exact legal instant of transfer." 2017-Ohio-809, ¶ 19. The court of appeals reasoned, "The appropriate understanding of the phrase 'at the time of the transfer' is the 'period' of the transfer * * *, not just an arbitrarily determined singular date that is perhaps set forth as a legal effective date in

6

company or asset transfer documents." *Id*. at ¶ 18. "Applying this legal principle to a common sense and perhaps more easily understandable situation," it elaborated, " 'the time of the American Revolution' encompasses all the events of the American Revolution, not only the moment the last signature dried on the Declaration of Independence." *Id*. On this basis, the court of appeals held that the trial court erroneously construed the statute to require simultaneous "ownership, management, or control" of both companies at the time of the legal asset transfer. The court also concluded that the common pleas court improperly found that at the time of the transfer, New Delphi was not an employer under the statute.

{¶ 17} New Delphi appealed, and we accepted jurisdiction on two propositions of law. 151 Ohio St.3d 1452, 2017-Ohio-8842, 87 N.E.3d 221. The first proposition challenges the trial court's construction of the term employer under R.C. 4141.01(A)(1)(a). The second asserts that "the time of the transfer" under R.C. 4141.24(G)(1) "means the point at which the trade or business transfers to the transferee, not an indefinite period of undefined length subsequent thereto."

{¶ 18} We first take up New Delphi's second proposition of law. Because our resolution of that proposition in New Delphi's favor resolves the case, we do not reach New Delphi's first proposition of law.

### "At the time of the transfer"

{¶ 19} This case turns on the statutory meaning of the phrase "at the time of the transfer." Because context is critical, we return to the language of the statute:

> If an employer transfers its trade or business, or a portion thereof, to another employer and, *at the time of the transfer, both employers are under substantially common ownership, management, or control*, then the unemployment experience attributable to the transferred trade or business, or portion thereof, shall be transferred to the employer to whom the business is so

transferred. The director shall recalculate the rates of both employers and those rates shall be effective immediately upon the date of the transfer of the trade or business.

(Emphasis added.) R.C. 4141.24(G)(1).

{¶ 20} The state asserts that the "time of the transfer" encompasses the entire time frame necessary to complete all phases of the contemplated business conversion, which could be a weeks- or months-long process. In this view, because the management group that controlled Old Delphi at the beginning of the transition period ended up controlling New Delphi at the end of the transition period, the two entities were under the same management "at the time of the transfer." New Delphi, on the other hand, contends that the provision contemplates concurrent, shared control of both employers when the legal transfer of assets is effectuated. We have little difficulty concluding that the plain language of the statute supports New Delphi's reading.

{¶ 21} In reaching a contrary conclusion, the court of appeals relied upon a dictionary definition of "time" as " '[a] particular period indicated or characterized in some way, either explicitly (usu. with *of*) or by anaphoric reference (as ***at the time***, etc.).' " (Boldface added in *Delphi*.) 2017-Ohio-809 at ¶ 17, citing *Oxford English Dictionary* (online Ed.Sept. 2016). But the same dictionary relied upon by the court of appeals offers numerous other definitions, including "the moment or point of time at which something happens." *Oxford English Dictionary*, https://www.oed.com/viewdictionaryentry/Entry/202100 (accessed Apr. 9, 2020) [https://perma.cc/GY2M-73LR]. Similarly, *Webster's Third New International Dictionary* offers multiple definitions of "time," including "a period during which something * * * exists," "a point or period when something occurs **:** the moment of an event," and "a definite moment, hour, day or year as indicated or fixed by a clock or calendar." *Webster's Third New International Dictionary* 2394 (2002). The

8

point is, each side can point to dictionary definitions to support its preferred reading. To decide which reading is correct, we need to look at how the word is used within the context of the statutory text. *Great Lakes Bar Control, Inc. v. Testa*, 156 Ohio St.3d 199, 2018-Ohio-5207, 124 N.E.3d 803, ¶ 8-9; Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* 56 (2012) ("words are given meaning by their context").

{¶ 22} In adopting an expansive understanding of the statutory phrase, the court of appeals found it significant that when we use phrases like "at the time of the American Revolution," we are referring to a period—or span—of time. But in that context, that makes sense. We don't think of the American Revolution as a discrete event that happened at one moment in time; rather, most people think about the American Revolution as encompassing a multiyear stretch roughly from the signing of the Declaration of Independence to the signing of the Treaty of Paris.

{¶ 23} In other contexts, however, when we use the phrase "at the time of," it is clear that we are speaking of a discrete moment in time. For example, one might say, "At the time of my scheduled court appearance, I was stuck in traffic." In that context, no one would think that the speaker was referring to a span of hours or days or weeks but rather to the exact moment that he was supposed to be in court. "At the time of the American Revolution" may mean a period of time spanning a number of years, but if we were to say, "Thomas Jefferson was napping at the time of John Hancock's signing of the Declaration of Independence," we would almost certainly be referring to a precise point in time on August 2, 1776. Thus, to understand the meaning of the phrase "at the time of," we need to understand the surrounding words and the purpose for which the phrase is used.

{¶ 24} At issue here is "at the time of *the transfer*." Importantly, we are dealing with a phrase from a statute, a legal text. And in the legal context, there is a precise time at which the transfer of a business occurs. This is made clear by the second sentence in the mandatory-transfer provision, which states that the

applicable tax rate shall be effective "immediately upon the date of the transfer of the trade or business." R.C. 4141.24(G)(1). By mandating that the tax rate be applied "immediately upon the date of the transfer," *id.*, the legislature plainly indicated that it understood transfers of business ownership to occur at a precise time, rather than over a period of weeks. Were we to conclude otherwise and adopt the court of appeals' conclusion that the business was transferred over a multiday period, it would be impossible to apply the statute's requirement that the tax be effective "upon the date of transfer," *id.*

{¶ 25} The state's own administrative rules reflect the idea that there is a definite date of transfer. *See*, *e.g.*, Ohio Adm.Code 4141-17-05(D) (providing that the transferee is liable for unemployment-compensation benefits paid "after the effective date of the transfer"); Ohio Adm.Code 4141-17-05(E) (stating that the contribution rates for the transferor and transferee "shall be effective the date of the transfer"). Indeed, without such an understanding, the scheme would be almost impossible to administer: who could know what tax is owed when and by whom and who is responsible for other legal obligations, without some clear demarcation of when the transfer of the business occurred?

{¶ 26} Further support for New Delphi's reading of the statute is found in the statute's mandate that the prior owner's tax rate be imposed if "at the time of the transfer, both employers *are under* substantially common ownership, management, or control." (Emphasis added.) R.C. 4141.24(G)(1). The use of the present tense indicates that the common ownership, management, or control must be concurrent—in other words, that both employers simultaneously *are under* the same ownership, management, or control. *See*, *e.g.*, *Continental Hydraulics, Inc. v. Dept. of Emp. & Economic Dev.*, 832 N.W.2d 298, 301 (C.A.Minn.2013) ("Use of the present tense suggests a temporal requirement—that the common management or control must be concurrent").

**{¶ 27}** The evidence is undisputed that at the time of the transfer (October 6, 2009), Old Delphi was a wholly owned subsidiary of Delphi Corporation, while New Delphi was owned, managed, and controlled entirely by the hedge funds. When the transfer occurred, the two entities did not share any common ownership, management, or control. Thus, by its plain terms, the mandatory-transfer provision of R.C. 4141.24(G)(1) does not apply. The court of appeals erred in concluding otherwise.

### Conclusion

**{¶ 28}** We adopt New Delphi's second proposition of law and hold that the language in R.C. 4141.24(G)(1) requires concurrent ownership, management, or control of both employers at the time that the business or trade is transferred. As our resolution of New Delphi's second proposition of law resolves the case, we decline to address its first proposition of law. We reverse the decision of the Tenth District Court of Appeals and reinstate the judgment of the Franklin County Court of Common Pleas.

Judgment reversed

and trial court's judgment reinstated.

O'CONNOR, C.J., and KENNEDY, CARR, FISCHER, DONNELLY, and STEWART, JJ., concur.

FISCHER, J., concurs, with an opinion.

DONNA J. CARR, J., of the Ninth District Court of Appeals, sitting for FRENCH, J.

_____

**FISCHER, J., concurring.**

**{¶ 29}** I fully and respectfully agree with the opinion of the court. I write separately, however, to point out what I see as another basis for the court's conclusion today: common sense. After all, "[t]he rules of legal interpretation are

rules of *common sense*, adopted by the courts in the construction of laws." (Emphasis sic.) The Federalist No. 83 at 496 (Rossiter Ed.1961).

{¶ 30} The law before us, R.C. 4141.24(G)(1), says that it applies only when "at the time of the transfer, both employers are under substantially common ownership, management, or control."

{¶ 31} Appellee, the Ohio Department of Job and Family Services, argues that this law applies to appellant, Delphi Automotive Systems, L.L.C. ("New Delphi"), based on New Delphi's acquisition of certain assets from Old Delphi. However, New Delphi acquired the assets that allegedly triggered the application of R.C. 4141.24(G)(1) via the bankruptcy process. Given that fact and the record in this case, common sense tells us that R.C. 4141.24(G)(1) does not apply here.

{¶ 32} As a part of Old Delphi's trip through the bankruptcy system, Old Delphi reached an agreement with its creditors, including New Delphi, under which the creditors would take the distressed company's assets *free and clear*. That agreement was memorialized in the form of a document titled "Master Disposition Agreement." Importantly, that agreement tells us that the transfer took place at a discrete moment in time—the closing—and that New Delphi and Old Delphi were not under "common ownership, management, or control," R.C. 4141.24(G)(1), at that time.

{¶ 33} If there were any lingering doubts, the United States Bankruptcy Court for the Southern District of New York confirmed these realities when it reviewed the Master Disposition Agreement and approved the sale of Old Delphi's assets. *In re Delphi Corp.*, Bankr.S.D.N.Y. No. 05-4481, 2009-WL-2482146 (July 30, 2009). In doing so, the bankruptcy court specifically found that the deal took place at an arm's length, meaning that none of the entities involved were affiliated with each other in any way or controlled by the same directors, officers, or managers. *Id.* at *7. That court also acknowledged that New Delphi was not "a mere continuation" of Old Delphi, *id.* at *9, and that there was "*no continuity of*

*ownership or enterprise between any of the Purchasing Entities and the Debtors*." (Emphasis added). *Id.*

**{¶ 34}** The record in this case makes it abundantly clear then that at the discrete moment in time when the transfer at issue occurred, New Delphi and Old Delphi were not under "common ownership, management, or control," R.C. 4141.24(G)(1).

**{¶ 35}** Thus, in addition to the reasons stated in the majority opinion, common sense dictates the conclusion that R.C. 4141.24(G)(1) is inapplicable here. Therefore, I respectfully concur.

_____

Vorys, Sater, Seymour & Pease, L.L.P., Michael J. Ball, Daniel E. Shuey, and Jonathan R. Vaughn, for appellant.

Dave Yost, Attorney General, Michael J. Hendershot, Chief Deputy Solicitor, Benjamin M. Flowers, Diane Richards Brey, and Stephen P. Carney, Deputy Solicitors, and Eric A. Baum Jr., Assistant Attorney General, for appellee.

_____