[Cite as *17AP-145*, 2018-Ohio-3028.]

IN THE COURT OF APPEALS OF OHIO

TENON APPELLATE DISTRICT

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| American Water Management Services, LLC, n.k.a. AWMS Water Solutions, LLC, | : | |
| | : | |
| Appellant-Appellee, | : | No. 17AP-145 |
| v. | : | (C.P.C. No. 16CV-6218) |
| Division of Oil & Gas Resources Management, | : | (REGULAR CALENDAR) |
| | : | |
| Appellee-Appellant. | : | |
| | : | |

D E C I S I O N

Rendered on July 31, 2018

**On brief:** *Comstock, Springer & Wilson Co., LPA*, and *Thomas J. Wilson*, for appellant-appellee. **Argued:** *Thomas J. Wilson.*

**On brief:** *Michael DeWine*, Attorney General, *Brett A. Kravitz*, and *Brian Becker*, for appellee-appellant. **Argued:** *Brett A. Kravitz.*

APPEAL from the Franklin County Court of Common Pleas

BRUNNER, J.

{¶ 1} Appellee-appellant[1], Division of Oil & Gas Resources Management of the Ohio Department of Natural Resources (separately "ODNR Oil & Gas" or "division" or "ODNR"), appeals a December 23, 2016 decision and a February 21, 2017 entry of the Franklin County Court of Common Pleas, acting as an appellate court for ODNR and reversing a decision of the Oil & Gas commission ("commission") that affirmed an order of

---

[1] Because this is an appeal pursuant to R.C. 119.01 et seq. the parties are listed first by their status as appellant or appellee before the common pleas court on administrative appeal and second by the status as appellant or appellee before this court of appeals.

the Chief of ODNR Oil & Gas ("Chief") instructing appellant-appellee, AWMS Water Solutions, LLC ("AWMS") to shut-in their No. 2 injection well at AWMS' wastewater injection site in Weathersfield Township, Trumbull County, Ohio. Following its decision on administrative appeal, the common pleas court entered a judgment that included a plan for the resumption of wastewater injection activities at the AWMS site. Because we find that the common pleas court did not account for the mandate of R.C. 1509.02[2] to the Chief of the division and the scientific possibility for seismic events to increase suddenly in magnitude and spread beyond the drilling site, the common pleas court's judgment is unreasonable and unlawful and must be reversed.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2} Following approximately ten minor earthquakes in 2011, the most significant of which were of magnitude 2.7, ODNR ordered a waste injection well[3] known as "Northstar 1" to cease operation. (Admin. Record at 1171, 1192, filed August 1, 2016.) At 5:00 p.m. on December 30, 2011, a representative of ODNR witnessed the well shutdown. *Id.* at 1171. The following day, the area around Youngstown, Ohio (near the Northstar 1 well) experienced a 4.0 earthquake. *Id.* at 1172, 1192. Following that event, ODNR Oil & Gas declared a one-year moratorium on waste-water injection permits to study the issue of induced seismicity (earthquakes caused by human activities). *Id.* at 900-02.

{¶ 3} One week before the shutdown of Northstar 1, on December 23, 2011, AWMS had applied for a permit to drill a class 2 waste injection well at a site known as AWMS No. 2 in Trumbull County, Ohio, approximately seven miles from Northstar 1. *Id.* at 641-43, 969, 1026. Because of the moratorium, it took approximately 19 months for the permit to be granted and 27 months before the AWMS No. 2 well became operational. *Id.* at 616-17. When the permits to drill and operate issued, they did so with a considerable volume of conditions and specifications, including a catch-all provision requiring the operation of

---

[2] R.C. 1509.02 has provided since before December 23, 2011 "[t]he regulation of oil and gas activities is a matter of general statewide interest that requires uniform statewide regulation, and this chapter and rules adopted under it constitute a comprehensive plan with respect to all aspects of the locating, drilling, well stimulation, completing, and operating of oil and gas wells within this state, including site construction and restoration, permitting related to those activities, and the disposal of wastes from those wells." R.C. 1509.02 (2011 amendment notes, noting that "[t]he 2011 amendment * * * inserted 'well stimulation,' 'completing,' 'construction and,' " into the quoted text); *see* 2010 Am.Sub.S.B. No. 165 (archived online at 2009 Ohio SB 165).

[3] An injection well as used in this context is a well designed to pump fluid underground into porous geologic formations as a means of disposal.

AWMS No. 2 well to be in compliance with all requirements of R.C. Chapter 1509 and Ohio Adm.Code 1501:9-3. *Id.* at 962-63, 1028-30. But the conditions and specifications of the permits did not address what would happen if more earthquakes, including human-induced earthquakes, transpired.

{¶ 4} In May and June 2014, AWMS began to use its No. 2 well to commercially dispose of drilling waste water. *Id.* at 617-18. On July 28, 2014, seismic activity of magnitude 1.7 occurred in Weathersfield Township near the AWMS No. 2 site. *Id.* at 280-81. Another tremblor, this one of magnitude 2.1, occurred in roughly the same location on August 31, 2014. *Id.* Three days later, on September 3, 2014, the Chief of ODNR Oil & Gas issued an order (No. 2014-372) requiring a suspension of all well operations (also known as a "shut-in") until ODNR Oil & Gas "c[ould] further evaluate the well." *Id.* AWMS immediately complied. *Id.* at 618-19. Two days later, the Chief issued a second order (No. 2014-374) concluding that the seismic events were not certain to be related to AWMS' well operations but that they "may" have been. *Id.* at 283. The No. 2014-372 order also required AWMS to "submit a written plan to the Division for evaluating the seismic concerns associated with the operation of the AWMS #2 saltwater injection well." *Id.* at 281.

{¶ 5} By way of background, we note that the byproducts of drilling are loosely referred to in the record as "saltwater" or "brine." "Brine" is legally defined as "all saline geological formation water resulting from, obtained from, or produced in connection with exploration, drilling, well stimulation, production of oil or gas, or plugging of a well." R.C. 1509.01(U). But "saline geological formation water" is legally distinct in Ohio from the "fluids" used in the "drilling of a well, flowback from the stimulation of a well, and other fluids used to treat a well." R.C. 1509.226(B)(10). According to the U.S. Geological Survey ("USGS"):

> In general, hydraulic fracturing fluid is composed of water, proppant (typically sand), and chemicals. A public Web site known as FracFocus has been established by industry that lists specific materials used in many, but not all, hydraulically fractured wells. Individual companies select a few chemicals to be used from hundreds that are available and the fluids are tailored to the rocks they are being injected into as well as the conditions at the well site. Reporting to the FracFocus Web site is mandatory in some states and voluntary in the rest. The

specific formulation of some chemicals may be trade secrets
that may be exempt from reporting on the site.

United States Geological Survey, *What is in the fluid injected into the ground during hydraulic fracturing?*, www.usgs.gov/faqs/what-fluid-injected-ground-during-hydraulic-fracturing? (Accessed June 7, 2018).

{¶ 6} On September 17, 2014, AWMS submitted a nine-page letter detailing the history of induced seismicity, AWMS' use of No. 2 well, comparing it to other wells that are associated with induced seismicity. (Admin. Record at 1037-45.) Among other points, AWMS noted that Northstar 1 had been permitted to inject at greater depth and higher pressure than AWMS No. 2 well. *Id.* at 1038. AWMS described an approach to induced seismicity gaining acceptance in the industry known as the traffic light approach wherein low magnitude seismic events would not trigger a response, slightly higher-level events would trigger a cut-back in the rates and pressures of pumping, and a significant event would lead to a cessation of activities. *Id.* at 1042-43. AWMS suggested following the traffic light approach. Specifically, AWMS suggested continuous monitoring while cutting back the volume and pressure by 20 percent for 20 days then slowly increasing it if no further seismic events occurred. *Id.* at 1043-45. The plan provided for again reducing the flow and pressures if minor events occurred and ceasing operations immediately if an imminent threat to safety, health, or the environment appeared. *Id.* at 1045.

{¶ 7} No one from the division contacted AWMS to collaborate on the plan or critique what AWMS had submitted. *Id.* at 621-23, 898-99. On October 2, 2014, AWMS appealed the Chief's orders to the Oil & Gas commission. *Id.* at 275.

{¶ 8} In a meeting on February 24, 2015, shortly before the March 11, 2015 hearing on the appeal, ODNR Oil & Gas provided AWMS with a "demonstrative" list of 14 criteria they were planning to use in creating a policy on how to treat earthquakes caused by human activity or induced seismicity. *Id.* at 623-24, 1046. AWMS responded on March 4, 2015, addressing each of the 14 criteria stating whether and when AWMS had already addressed it or how AWMS could address it. *Id.* at 624-25, 1048-51. Concerning two criteria having to do with modeling the underground topography and pressure front growth, AWMS noted it would need more detail about the objectives and purposes of this modeling before it could engage a firm to complete it. *Id.* at 1050. With respect to some criteria, AWMS also noted

that it would only be possible to collect responsive data if the well were operating. *Id.* at 1049-50. Once again, the division did not respond to AWMS. *Id.* at 624-27.

{¶ 9} At the hearing on the appeal on March 11, 2015, the Chief of ODNR Oil & Gas testified that although the division initially intended to deal with AWMS' well on an individual basis, ODNR Oil & Gas had instead decided to work with interstate commissions to develop and implement a policy on induced seismicity and that the Chief was not intending to consider AWMS' well until that work was done. *Id.* at 883-87, 890-95. When asked, the Chief could give no answer as to when that policy might be in place. *Id.* at 892-95. He admitted that no one from ODNR Oil & Gas contacted AWMS to work with it on the plan it submitted but said he might consider a plan from AWMS if it were a "very comprehensive plan." *Id.* at 895-96, 903-04. The Chief also stated that, although ODNR Oil & Gas staff developed a letter giving AWMS permission to operate at less than 50 percent of their originally permitted capacity under a series of other conditions, he never signed it because he felt it was not comprehensive enough. *Id.* at 896-98. He admitted that one barrel of injected material per day would be extremely unlikely to cause any problems but declined to speculate as what level of operation would be appropriate. *Id.* at 903. He stated that AWMS had fully complied with all permits and orders and that there has been no allegation that AWMS misled the division or acted negligently. *Id.* at 899-900.

{¶ 10} The vice president of AWMS also testified. He explained that while AWMS is a subsidiary of a larger company and while AWMS maintains another well (Northstar 1), AWMS No. 2 well is approximately 95 percent of AWMS' business. *Id.* at 614-15, 649-50. He testified that if No. 2 well is not reactivated, AWMS will go out of business. *Id.* at 627. AWMS' vice president also testified that meetings with ODNR Oil & Gas had led AWMS to believe that No. 2 well would be allowed to reopen. *Id.* at 628-30. But, he said, he understood that the division had changed its approach at some juncture and refused to consider the matter further until the State of Ohio had completed some final policy-making on induced seismicity. *Id.* at 630.

{¶ 11} Two expert witnesses also testified on behalf of AWMS. *Id.* at 593. Both acknowledged that the two "microseismic" events in July and August near the AWMS wells were likely caused by AWMS' activities with No. 2 well. *Id.* at 745-47, 793-94. However, based on their decades of experience and analysis of other wells in Ohio, both testified that

the traffic light approach could allow AWMS' No. 2 well to operate safely. *Id.* at 697-701, 788-89; *see also id.* at 1064, 1088. Both declined to conclude that the shut-in of the AWMS well was "unreasonable," as that was a legal conclusion for the commission rather than a scientific opinion. *Id.* at 744, 805. But both expressed the belief that a complete shut-in was unnecessary and that the well had not produced any seismicity that would have had any impact on public health or safety. *Id.* at 744, 788-90, 797-98. One expert laid out the general ranges of magnitudes stating that quakes below 2.5 magnitude are usually not felt by humans and even minor damage to structures typically does not occur until the 3.5 to 3.8 range. *Id.* at 774-76.

{¶ 12} On August 12, 2015, the commission affirmed the shut-in order of the division's Chief. *Id.* at 331. It recognized that the Chief did not intend to allow resumption of injection operations at AWMS No. 2 well until a state policy on injection-induced seismicity was in place. *Id.* at 338. The commission recognized that AWMS had not violated any terms of its injection permit nor did anything that could constitute a "material and substantial violation" as defined in R.C. 1509.01(EE). *Id.* The commission recognized that it was the opinion of both experts who testified in the hearing on behalf of AWMS that although the small seismic events were likely associated with injections into AWMS No. 2 well, resumption of activities at AWMS No. 2 well could be accomplished safely at lower volumes and pressures with monitoring as contemplated by the traffic light system. *Id.* at 339. The commission stated, however, that neither expert "could state that the Chief's issuance of the Suspension Order was unreasonable given the specific facts of this matter." *Id.* at 340. The commission recognized that nowhere in R.C. Chapter 1509 or implementing sections of the Ohio Administrative Code is a chief specifically empowered to suspend operations or to revoke a permit based on induced seismicity where there is no accompanying "material and substantial violation" by the operator. *Id.* at 344. Nonetheless, based on what the commission characterized as the Chief's "exclusive jurisdiction over injection operations," the commission inferred that the Chief had such a power by implication. *Id.* at 345-47. Then, with respect to whether the Chief's order was reasonable, the commission concluded:

> The Commission must defer to the expertise of the Division. If the Division has identified a problem, or a lack of adequate information to evaluate seismic concerns associated with the

> AWMS #2 Well, the Commission must respect that agency's position. The Commission finds that the suspension of injection operations at the AWMS #2 Well is appropriate under the facts of this specific case.

*Id.* at 349.

{¶ 13} On September 8, 2015, AWMS filed a notice of appeal with the Franklin County Court of Common Pleas. *Am. Water Mgmt. Servs., LLC v. Div. of Oil & Gas Resources Mgmt.*, 10th Dist. No. 16AP-4, 2016-Ohio-2860, ¶ 4. The common pleas court dismissed the appeal because AWMS did not file the notice of appeal with the commission as required by R.C. 1509.37 and AWMS appealed to this Court. *Id.* We found that the commission had not properly given notice of its decision to the parties and remanded to the commission for it to comply with R.C. 1509.36. AWMS thereby received a second chance to appeal the commission's decision with the common pleas court and timely appealed it when it was re-issued on June 21, 2016. *Id.* at ¶ 13-15. (June 30, 2016 Notice of Appeal; Ex. A, June 21, 2016 Order after Remand, attached to June 30, 2016 Notice of Appeal.)

{¶ 14} In the common pleas court, the parties engaged in briefing on the merits and AWMS submitted, but subsequently withdrew, a motion to include additional evidence. (July 22, 2016 AWMS Mot. to Include Additional Evidence; Aug. 12, 2016 AWMS' Brief; Sept. 22, 2016 Division's Brief; Sept. 29, 2016 AWMS' Reply Brief; Nov. 1, 2016 Hearing Tr. at 4, filed Jan. 27, 2017.) The trial court also held oral argument on the merits on November 1, 2016.

{¶ 15} On December 23, 2016, the court of common pleas issued a decision on the appeal. (Dec. 23, 2016 Decision & Order.) The common pleas court concluded that the Chief of ODNR Oil & Gas had legal authority to suspend the operation of the AWMS No. 2 well, notwithstanding the lack of any violation on the part of AWMS. *Id.* at 9. However, the common pleas court found that the Chief's decision was unreasonable. The court noted that both experts who evaluated AWMS' plan found it was a reasonable and responsible method for reinstating operations at the well and that the division had not responded to the plan or evaluated the well, rather, using the AWMS No. 2 well situation as a catalyst to justify developing a statewide policy. *Id.* at 11, 13. The common pleas court found that ODNR Oil & Gas had "stalled" for over 26 months, denying AWMS a site-specific evaluation and plan to restart its well despite AWMS' full cooperation. *Id.* at 14. It concluded that

there was "no factual basis for [the division] to continue the suspension of the operation of the AWMS #2 Well." *Id.* at 15. The common pleas court observed that it would prefer for the parties to work together in developing a comprehensive plan for restarting the well, but, given the history of the delays, it instead ordered each party to submit a proposed entry "setting forth the order that the Commission should have made to restart the AWMS #2 Well that would initially limit the amount of volume, the amount of saltwater and brine that is being put into the well; initially limit the amount of pressure used; and then incrementally increase the volume and pressure while simultaneously providing constant monitoring for seismicity; and address the concerns of public health and safety." *Id.* at 16.

{¶ 16} ODNR Oil & Gas filed a notice of appeal from the common pleas court's decision and order on January 19, 2017. (Jan. 19, 2017 Notice of Appeal.) This Court dismissed that appeal on February 22, 2017 as not having been taken from a final appealable order. *Am. Water Mgmt. Servs., LLC v. Div. of Oil & Gas Resources Mgmt.*, 10th Dist. No. 17AP-45 (Feb. 22, 2017) (Entry).

{¶ 17} The day before, on February 21, 2017, having reviewed proposed entries submitted by both parties, the trial court issued an entry ordering AWMS No. 2 well to restart under a number of restrictive conditions. (Feb. 21, 2017 Jgmt. Entry.) Principally, these conditions consisted of reduced pressures and volumes, constant monitoring, and adjustments depending on observed levels of earthquakes. *Id.* at 2-5. However, there was also a provision that "if at any time an imminent threat to safety, health, or the environment is experienced at or near the facility for any reason, injection operations will immediately cease and will not resume until two representatives of AWMS and two representatives from the Commission determine that the threat has passed and it is safe to resume operations." *Id.* at 5.

{¶ 18} ODNR Oil & Gas timely appealed to this Court. (Feb. 22, 2017 Notice of Appeal.)

{¶ 19} On March 21, 2017, this Court stayed the common pleas court's entry during the pendency of this appeal. *Am. Water Mgmt. Servs., LLC v. Div. of Oil & Gas Resources Mgmt.*, 10th Dist. No. 17AP-145 (Mar. 21, 2017) (Entry). As a consequence, and because the Chief's original order requiring the well to be shut-in has never been stayed, AWMS No.

2 well has been shut-in since the original order on September 3, 2014 and continues to in effect remain dormant as of the date of this decision. *See* Admin. Record at 618-19.

## II. ASSIGNMENTS OF ERROR

{¶ 20} The division assigns four alleged errors for our review:

[1.] The Court of Common Pleas erred by vacating the Oil & Gas Commission's order and establishing a plan for resuming AWMS #2 Well operations because it lacked the authority and jurisdiction to issue a plan that (1) creates a new board not authorized by statute to determine imminent seismic threat issues; (2) infringes upon the sole and exclusive authority of the Chief to regulate injection operations as mandated by the General Assembly; (3) bypasses the Chief's statutorily required technical review; and (4) modifies an operating permit not under appeal.

[2.] The Court of Common Pleas erred by requiring the Chief to develop his own plan for restarting the AWMS #2 Well operations when the Common Pleas Court lacks the authority and jurisdiction to order the Chief to develop an operator's plan to address a chief's order.

[3.] The Court of Common Pleas erred in vacating the Oil & Gas Commission's decision and establishing a plan for resuming AWMS #2 Well operations because it abused its discretion in reaching a conclusion concerning seismic risk outside the AWMS site with no evidentiary support from the record.

[4.] The Court of Common Pleas erred in vacating the Oil & Gas Commission's order and establishing a plan for resuming AWMS #2 Well operations because it unlawfully relied on evidence that was not newly discovered evidence under R.C. 1509.37.

## III. DISCUSSION

### A. Standards of Appellate Review

{¶ 21} In an appeal to the commission from an order of the Chief of ODNR Oil & Gas, "[i]f * * * the commission finds that the order appealed from was lawful and reasonable, it shall make a written order affirming the order appealed from; if the commission finds that the order was unreasonable or unlawful, it shall make a written order vacating the order appealed from and making the order that it finds the chief should have made." R.C. 1509.36. In an appeal from the commission to the Franklin County Court of Common Pleas, "if the court finds that the order of the commission appealed from was

lawful and reasonable, it shall affirm the order." R.C. 1509.37. If the court of common pleas "finds that the order was unreasonable or unlawful, it shall vacate the order and make the order that it finds the commission should have made." *Id.* Recently, we reiterated this standard involving appeals of decisions from the Oil & Gas commission in *Simmers v. N. Royalton*, 10th Dist. No. 15AP-900, 2016-Ohio-3036, ¶ 21-24.

> The standard of review on an appeal for the common pleas court from the commission is whether the commission's order was reasonable and lawful. *Martz v. Div. of Mineral Resources Mgt.*, 10th Dist. No. 08AP-12, 2008-Ohio-4003, P 13; *Johnson v. Kell*, 89 Ohio App.3d 623, 625, 626 N.E.2d 1002 (10th Dist.1993).
>
> "If the court finds that the order of the commission appealed from was lawful and reasonable, it shall affirm the order. If the court finds that the order was unreasonable or unlawful, it shall vacate the order and make the order that it finds the commission should have made. The judgment of the court is final unless reversed, vacated, or modified on appeal." R.C. 1509.37.
>
> "Unlawful" is defined as that which is not in accordance with law, while "unreasonable" is defined as that which is not in accordance with reason or that which has no factual foundation. *Johnson*, citing *Citizens Commt. to Reserve Lake Logan v. Williams*, 56 Ohio App.2d 61, 70, 381 N.E.2d 661 (10th Dist.1977).
>
> Upon appeal to this court from the court of common pleas, however, our standard of review is more restrictive. *Childs v. Oil & Gas Comm.*, 10th Dist. No. 99AP-626, 2000 Ohio App. LEXIS 1242 (Mar. 28, 2000), citing *Lorain City Bd. of Edn. v. State Emp. Relations Bd.*, 40 Ohio St.3d 257, 260-61, 533 N.E.2d 264 (1988). This court determines if the common pleas court abused its discretion. *Id.* However, on questions of law, the common pleas court does not exercise discretion, and this court's review is plenary. *Childs, citing Univ. Hosp., Univ. of Cincinnati College of Med. v. State Emp. Relations Bd.*, 63 Ohio St.3d 339, 587 N.E.2d 835 (1992); *B & D Drilling v. State*, 10th Dist. No. 02AP-52, 2002-Ohio-5010, ¶ 12.

*Id.* Thus, as to factual issues, our review is limited to a determination of whether the trial court abused its discretion. *Ohio Dept. of Job & Family Servs. v. Delphi Automotive Sys., Inc.*, 10th Dist. No. 14AP-971, 2017-Ohio-809, ¶ 14, citing *Miracle Home Health Care, LLC*

*v. Ohio Dept. of Job & Family Servs.*, 10th Dist. No. 12AP-318, 2012-Ohio-5669, ¶ 18 (citing numerous cases). And although an abuse of discretion is typically defined as an unreasonable, arbitrary, or unconscionable decision, no court has the authority, within its discretion, to commit an error of law. *Delphi Automotive Sys., Inc.* at ¶ 14, citing *State v. Jones*, 10th Dist. No. 15AP-596, 2016-Ohio-4766, ¶ 15, citing *State v. Moncrief*, 10th Dist. No. 13AP-391, 2013-Ohio-4571, ¶ 7; *see also JPMorgan Chase Bank, N.A. v. Liggins*, 10th Dist. No. 15AP-242, 2016-Ohio-3528, ¶ 18, quoting *State v. Akbari*, 10th Dist. No. 13AP-319, 2013-Ohio-5709, ¶ 7. Statutorily, the final result of our review of the common pleas court's decision is that we may either affirm, reverse, or modify the common pleas court's decision on review. R.C. 1509.37

### B. First Assignment of Error - Whether the Trial Court Exceeded its Jurisdiction or Authority in Issuing the Decision and Entry in this Case

{¶ 22} ODNR Oil & Gas argues that the common pleas court lacked jurisdiction and authority to "(1) create[] a new board * * * to determine imminent seismic threat issues; (2) infringe[] upon the sole and exclusive authority of the Chief to regulate injection operations * * *; (3) bypass[] the Chief's * * * technical review; * * * and (4) modif[y] an operating permit not under appeal." (Division's Brief at vii.) Specifically, the division argues that, under R.C. Chapter 1509, it has " 'sole and exclusive authority' to regulate the oil and gas permitting and production operations within the state of Ohio." (Division's Brief at 32, quoting R.C. 1509.02, citing *State ex rel. Morrison v. Beck Energy Corp.*, 143 Ohio St.3d 271, 2015-Ohio-485, ¶ 1.) ODNR Oil & Gas argues that it, and not the court of common pleas, is the sole enforcement authority in Ohio with respect to injection wells as designated by the federal Environmental Protection Agency. (Division's Brief at 34, citing 42 U.S.C. 300h-4; 48 Fed.Reg. 38238 (Sept. 22, 1983)[4].) ODNR Oil & Gas also argues that the Chief is tasked with issuing permits and ensuring that permit terms and conditions have been complied with; such that, as a consequence only the Chief, and not the common pleas court, has the power to set conditions for a well to reinitialize. (Division's Brief at 35-39.) Accordingly, ODNR Oil & Gas concludes that the common pleas court was without jurisdiction or authority to order the division to permit the reopening of AWMS No. 2 well.

---

[4] The division actually cites 48 Fed.Reg. 38328 (Aug. 23, 1983). (Division's Brief at 34.) However, as there is no such document, we assume that the citation was a clerical error and have stated the accurate citation.

{¶ 23} On February 3, 1983, ODNR applied for approval of its Underground Injection Control program and sought a delegation of "primacy" in administering and enforcing that program. 48 Fed.Reg. 6564 (Feb. 14, 1983). The application was presented according to 42 U.S.C. 300h-1 and 42 U.S.C. 300h-4, which addresses a delegation of "primary enforcement responsibility" to state governments by application and rule promulgation. In due course, Ohio's application was granted by the federal government. This federal grant of regulatory authority to ODNR with respect to class 2 injection wells is codified in 40 C.F.R. 147.1800 as announced in 48 Fed.Reg. 38238. Though the enabling federal regulation does not expressly adopt or endorse any particular appeals process, neither does it divest Ohio courts of jurisdiction, or deem invalid the statutory appeals process, or determine that the grant of "primary enforcement responsibility" to ODNR does away with state provided processes before a court of this state for relief from state administrative adjudications and determinations. *See* Ohio Constitution, Article I, Section 16 ("All courts shall be open, and every person, for an injury done him in his land, goods, person, or reputation, shall have remedy by due course of law, and shall have justice administered without denial or delay.").

{¶ 24} Thus, to determine the jurisdictional propriety of the Franklin County Court of Common Pleas' orders upon appeal from an administrative decision such as this, we look to the Ohio Constitution and Ohio statutes.

{¶ 25} "The courts of common pleas * * * shall have * * * such powers of review of proceedings of administrative officers and agencies *as may be provided by law*." (Emphasis added.) Ohio Constitution, Article IV, Section 4(B). Accordingly, the Ohio legislature has provided that if a court of common pleas finds that an order of the commission "was unreasonable or unlawful, it shall vacate the order and *make the order that it finds the commission should have made*." (Emphasis added.) R.C. 1509.37. In short, when a court of common pleas reverses an order of the commission it is empowered to make any order that the commission would be empowered to make and that it finds should have been made.

{¶ 26} The Oil & Gas commission is created by statute. R.C. 1509.35(A). Because of that, "its powers and duties extend only so far as the statutes grant authority, while being constrained by whatever limits the statutes impose." *Chesapeake Exploration, L.L.C. v. Oil*

*& Gas Comm.*, 135 Ohio St.3d 204, 2013-Ohio-224, ¶ 13.  As a matter of explicit statutory authorization, if the commission finds that an order from the Chief of ODNR Oil & Gas "was unreasonable or unlawful, it shall make a written order vacating the order appealed from and *making the order that it finds the chief should have made.*"  (Emphasis added.)  R.C. 1509.36.

{¶ 27} When R.C. 1509.36 and 1509.37 are considered together, notwithstanding the fact that ODNR Oil & Gas has "sole and exclusive authority" to regulate oil and gas, a common pleas court, sitting in an appellate capacity, is essentially empowered to make any order the Chief could have made.  R.C. 1509.02; R.C. 1509.36, 1509.37.  Hence, the proper question for analyzing each of AWMS' arguments is whether the Chief of ODNR Oil & Gas or the commission could have ordered the action of the common pleas court now under review on appeal.

### 1.  Creation of an Imminent Threat Board

{¶ 28} The division argues that the common pleas court's order created a new "board" to address imminent threats and that such a creation is rather the sole purview of the General Assembly.  (Division's Brief at 29-32.)  Specifically, the court of common pleas' entry setting forth conditions under which the AWMS No. 2 well could return to operation contains the following provision:

> Independent of the above provisions, if at any time an imminent threat to safety, health, or the environment is experienced at or near the facility for any reason, injection operations will immediately cease and will not resume until two representatives of AWMS and two representatives from the [c]ommission determine that the threat has passed and it is safe to resume operations.

(Feb. 21, 2017 Jgmt. Entry at 5.)

{¶ 29} R.C. 1509.04(A) provides that the "chief of the division of oil and gas resources management * * * shall enforce this chapter and the rules, terms and conditions of permits and registration certificates, and orders adopted or issued pursuant thereto."  R.C. 1509.03(D) provides that the "chief may issue orders to enforce this chapter, rules adopted thereunder, and terms or conditions of permits issued thereunder."  One of the provisions of the chapter provides that "no person shall place or cause to be placed * * * in or on the land * * * brine, crude oil, natural gas, or other fluids associated with the

exploration, development, well stimulation, production operations, or plugging of oil and gas resources that causes or could reasonably be anticipated to cause damage or injury to public health or safety or the environment." R.C. 1509.22(A). Read together, those sections provide the Chief with broad latitude to craft orders related to the disposal of brine in order to protect the environment and public health and safety.

{¶ 30} But although the Chief has (and therefore the commission and common pleas court also have) broad latitude in crafting orders regarding the disposal of brine to protect the environment and public health and safety, we agree that this portion of the common pleas court's order would have been beyond the Chief's authority and the commission's authority. Nothing in R.C. 1509.35 (which creates and defines the commission) renders it subordinate to the Chief's authority and nothing elsewhere in R.C. Chapter 1509 purports to give the Chief authority to issue orders to members of the commission. In fact, R.C. 1509.36 makes clear that far from being subordinate to the Chief, the commission is the immediate appellate authority with jurisdiction to overrule actions proposed or taken by the division and its Chief. And even if the Chief could have ordered the commission to act, the commission cannot act as a body without a quorum of at least three of its five members. R.C. 1509.35(B). Just two of the commission's members, as contemplated in the common pleas court in its entry, has no power to make any decisions on behalf of the commission. *Id.* We find no basis for the Chief to order commission members to do anything. Were it otherwise, a ridiculous result could ensue such as the Chief being empowered to order the members of the commission not to find the Chief's order unlawful or unreasonable.

{¶ 31} And the Chief cannot lawfully order two members of the commission to undertake the responsibility of evaluating "imminent threat[s] to safety, health, or the environment" in connection with the AWMS No. 2 well. (Feb. 21, 2017 Jgmt. Entry at 5.) Actions of two members of the commission, even if voluntarily undertaken, are not the action of a quorum. If the commission cannot do it, neither can the common pleas court. R.C. 1509.36; R.C. 1509.35(B), 1509.37. Clearly, this portion of the common pleas court's entry cannot be given effect.

### 2. The Sole and Exclusive Authority of the Chief to Regulate Injection Operations

{¶ 32} As previously described and cited, neither the federal grant of regulatory and enforcement authority to the division, nor R.C. Chapter 1509, denies or abrogates appellate

rights otherwise enjoyed by persons or entities affected by administrative decisions. *See* Ohio Constitution, Article I, Section 16 ("All courts shall be open, and every person, for an injury done him in his land, goods, person, or reputation, shall have remedy by due course of law, and shall have justice administered without denial or delay."); Ohio Constitution, Article IV, Section 4(B) ("The courts of common pleas * * * shall have * * * such powers of review of proceedings of administrative officers and agencies as may be provided by law.") Far from abrogating appellate rights, R.C. 1509.36 and 1509.37 specifically determine the appeal process and explicitly provide that the commission enjoys the ability to make any order the Chief could have made and that the common pleas court can make any order the commission could have made (which by transitive deduction, includes any order the Chief could have made). Thus, we do not agree that the grant of "sole and exclusive authority" in R.C. 1509.02 is intended to exclude the appellate bodies sitting in direct appeal of the division and its Chief pursuant to R.C. 1509.37.

### 3. Bypassing the Chief's Technical Review and Modifying a Permit not Under Appeal

{¶ 33} The division argues that the common pleas court issued a new operating permit with different conditions without following the required legal process to impose an order. (Division's Brief at 35-39.) But a review of the common pleas court's entry shows that this is not what occurred. Rather, the common pleas court ordered additional operating conditions for an existing permit in response to one or more circumstances unforeseen at the time the original permit was issued. (Feb. 21, 2017 Jgmt. Entry in passim.)

{¶ 34} The division has argued throughout this litigation that the Chief has the inherent power to issue orders related to the disposal of brine in order to protect the environment and public health and safety. *See, e.g.*, Sept. 22, 2016 Division's Brief at 17. Our review of R.C. Chapter 1509 causes us to agree with that conclusion. R.C. 1509.03(D); R.C. 1509.04(A); R.C. 1509.22(A). But the division cannot have it both ways. If the Chief has such power, then the appellate authorities over the Chief also have that power because in reversing the Chief, they may make any order he could have made. R.C. 1509.36; R.C. 1509.37.

{¶ 35} We sustain the division's first assignment of error insofar as we agree that the common pleas court lacked authority to issue an order requiring two members of the

commission to participate in oversight of AWMS No. 2 well. In all other respects, we overrule ODNR Oil & Gas' first assignment of error.

### C. Second Assignment of Error – Whether the Trial Court Prejudicially Erred in Ordering the Division to Submit a Proposed Entry

{¶ 36} The division argues that the common pleas court lacked the authority to order the Chief to propose a plan for dealing with AWMS' human-activity-related earthquakes. (Division's Brief at 40-42.) We agree for reasons explained in discussing the division's third assignment of error.

{¶ 37} Regardless, the division argues that the common pleas court "rejected" the division's (forced) submission and "largely adopted" the proposed entry submitted by AWMS. (Division's Brief at 6.) Since the common pleas court's error did not affect the ultimate result or any "substantial right[]" of any party, its error was harmless. Civ.R. 61.

{¶ 38} The division's second assignment of error is overruled as harmless.

### D. Third Assignment of Error – Whether the Common Pleas Court Drew Conclusions About Seismic Risk Without Evidentiary Support

{¶ 39} The division argues that the common pleas court improperly decided that AWMS No. 2 well could be restarted with little risk to the public and decided so without appropriate deference to the commission and the Chief, all without evidence to support the court's conclusions. (Division's Brief at 43-47.) For the reasons that follow, we find that argument to be well-taken. While the common pleas court had no duty to defer to the commission and Chief to an extent not contemplated in R.C. 1509.37, its findings had to have a basis in the record.

{¶ 40} When a court of common pleas finds an order of the commission to be "unreasonable or unlawful," it must "vacate the order and make the order that it finds the commission should have made." R.C. 1509.37. In discussing our standard of review, we previously defined "unreasonable" as being not in accordance with reason or having no factual foundation. *Simmers* at ¶ 23, citing *Johnson v. Kell*, 89 Ohio App.3d 623, 625 (10th Dist.1993); *Citizens Commt. to Reserve Lake Logan v. Williams*, 56 Ohio App.2d 61, 70 (10th Dist.1977). If the common pleas court is empowered to "make the order that it finds the commission should have made," it follows that its order must be reasonable and have a factual foundation. *Simmers* at ¶ 22.

{¶ 41} The division relies on cases involving statutory construction by courts in arguing that the common pleas court was required to observe more deference than is inherent in the legal construction of the statutory use of "unreasonable" for the purposes of appellate review. The cases the division would have us rely on in our appellate review of what the common pleas court did are inapposite because they stand for the proposition that "courts, *when interpreting statutes*, must give due *deference to* an *administrative interpretation* formulated by an agency which has accumulated substantial expertise, and to which the legislature has delegated the responsibility of implementing the legislative command." (Emphasis added.) *State ex rel. McLean v. Indus. Comm.*, 25 Ohio St.3d 90, 92 (1986); *see also Buckeye Power, Inc. v. Korleski*, 183 Ohio App.3d 179, 2009-Ohio-2232, ¶ 15-16 (10th Dist.). But our review of this appeal is less one of statutory interpretation, but rather, of whether what the Chief decided to do or not do under specific, factual circumstances was unreasonable, separate from the concept of unlawful. Thus, we do not look to these cases in reaching our decision to sustain the division's third assignment of error.

{¶ 42} All experts (including the Chief) who testified agreed that the seismic events (measuring 1.7 and 2.1 magnitude respectively) were likely related to AWMS' injection activities. (Admin. Record at 745-47, 793-94, 1088, 1229.) But no expert suggested that seismic events at such levels posed a danger to public health, safety, or the environment. *Id.* at 797-98. All experts also consistently testified that some level of injection could take place without putting public safety or the environment in significant jeopardy. *Id.* at 697-701, 788-89, 903; *see also id.* at 1064, 1088. AWMS' two experts opined that a substantial percentage of the well's original operating volume and pressure would be safe with monitoring along with the proffered traffic light approach. *Id.* at 697-701, 788-89; *see also id.* at 1063-64, 1088. The Chief admitted that one barrel per day would likely not create seismic activity of any danger, but he declined to speculate on what is an appropriate, safe level of operation. *Id.* at 903-04. Nor are we certain he would have been able to testify to this without undertaking the work necessary to put a statewide policy in place. This is, in fact, the basis for the Chief's decision, which is the subject of this appeal. Despite the Chief's opinion held in common with AWMS' experts, he decided not to allow AWMS No. 2 well to

resume unless and until a statewide policy could be adopted and applied.  *Id.* at 890-92, 903-04.

{¶ 43}  Our review of the record shows that the evidence was mixed on the question of how much or to what degree of injection could be safely accomplished at the AWMS No. 2 well.  It was not unreasonable for the Chief to refuse to speculate without a statewide policy as is contemplated by R.C. 1509.02.  Until that policy is developed, it is not unreasonable, in light of the history of the wells in question, to conclude that the only safe amount of injection was zero, at least for now.  But while the common pleas court characterized the Chief's decision to prevent any injection activities as being motivated by the division's preference to first allow some policy-making process of indeterminate duration to be completed, *see* Dec. 23, 2016 Decision & Order at 13-15, it concluded that the Chief acted unreasonably in "stalling for over twenty-six (26) months, * * * [and] denying A[WMS] a site-specific evaluation and plan to restart its well." *Id.* at 14.  We find that the common pleas court abused its discretion as a matter of law in reaching this conclusion.

{¶ 44}  The Chief was faced with the unenviable, if near impossible, prospect of predicting when an extraordinary event or circumstance such as an earthquake would occur when waste disposal injection reached certain, defined levels.  Normally, an earthquake is considered an "act of God."  That is, it is "so unusual and overwhelming as to do damage by its own power, without reference to and independently of" the actions of any particular person.  *Wright v. Ohio Dept. of Natural Resources*, Ct. of Cl. No. 2003-11755-AD, 2004-Ohio-3581, ¶ 7, citing *Piqua v. Morris*, 98 Ohio St. 42, 49 (1918).  In a tort liability setting, an "act of God" ascribes no liability.  *Wright* at ¶ 7.

> The term "Act of God," in its legal significance, means irresistible disaster, the result of natural causes, such as earthquakes, violent storms, lightning and unprecedented floods. [*Morris*, 98 Ohio St. 42] at 47-48.

> However, if proper care and diligence on the part of defendant would have avoided the act, it is not excusable as an "Act of God." *Bier v. City of New Philadelphia* (1984), 11 Ohio St. 3d 134, 11 Ohio B. 430, 464 N.E.2d 147.

*Wright* at ¶ 7-8.  The "force majeure" or "act of God" line of cases is relevant to these parties' dispute because all experts who testified agreed that it is *human activity* and not an "act of

God" that has caused the seismic and earthquake activity in question. As such, questions about the state's liability if damage were to occur are legitimate.

{¶ 45} It was not unreasonable for the Chief to seek and await guidance from a statewide policy that addressed this kind of seismic activity. In awaiting such guidance, we recognize that the timeline for its completion is affected by the time it takes to review other states' similar proposals, obtain approval from the Governor's office and achieve review and approval through the State's rulemaking process, including review and approval by the Ohio legislature's Joint Committee on Agency Rule Review. And according to statute, a uniform policy has been and is required. R.C. 1509.02 provides:

> The regulation of oil and gas activities is a matter of *general statewide interest that requires uniform statewide regulation*, and this chapter and rules adopted under it constitute a comprehensive plan with respect to all aspects of the locating, drilling, well stimulation, completing, and operating of oil and gas wells within this state, including site construction and restoration, permitting related to those activities, and the disposal of wastes from those wells.

(Emphasis added.) This statute was in effect well before the first noted seismic activity associated with AWMS' operations at the sites in question.

{¶ 46} The division further argues error in that the common pleas court included the following factual finding in its entry:

> Since all observed events have been located on the industrial parcel where AWMS is located (approximately 11,000-feet deep), it is likely that observed events will remain in the microseismic range and in same vicinity of those previously observed, thereby maintaining Seismic Risk to the public at near zero.

(Feb. 21, 2017 Jgmt. Entry at 8; Division's Brief at 44.) The division does not dispute that all the observed events were located on AWMS' industrial parcel and at depths of approximately 11,000 feet, or that all the events previously observed were in the microseismic range. Rather the division challenges the common pleas court's conclusion that if the restart plan is followed that such events will "likely * * * remain in the microseismic range and in same vicinity of those previously observed, thereby maintaining Seismic Risk to the public at near zero." (Division's Brief at 44-45.)

{¶ 47} The division essentially argues that the common pleas court's opining what was "likely" to happen in fashioning and implementing a restart plan was nothing more than speculation by the common pleas court that did not conform to the evidence in the record. We agree. The common pleas court's entry demonstrates that it disregarded the expert testimony of the Chief in favor of that of the two expert witnesses offered by AWMS. The Chief had testified that the Northstar 1 incident shows that it is possible for seismic events to increase suddenly in magnitude and spread beyond the drilling site. *Id.* Although, the Chief expressly declined to offer an opinion on what would happen if the AWMS No. 2 well were restarted at a reduced volume as proposed; his testimony clearly indicated that it would be next to impossible to say that it is "likely" for observed events to remain in the microseismic range and in same vicinity of those previously observed. (Admin. Record at 928-29.) The Chief's refusal to speculate at this juncture and the commission's refusal to reverse the Chief are evidence that predicting what is "likely" is extremely difficult at best and could be dangerous at worst.

{¶ 48} AWMS' experts both testified that they believed the well could be restarted safely according to the plan proposed by AWMS and this was similar to the plan eventually adopted by the common pleas court. *Id.* at 697-701, 788-89, 1063-64, 1088; *compare id.* at 1043-45, 1048-51 *with* Feb. 21, 2017 Jgmt. Entry at 2-5. But because the common pleas court's appellate powers of review are limited to whether the commission's decision was unreasonable or unlawful, the common pleas court exceeded its jurisdiction and abused its discretion in picking and choosing which experts to believe and drawing conclusions therefrom by which to fashion an order that it believed the Chief should have.

{¶ 49} We sustain the division's third assignment of error.

### E. Fourth Assignment of Error - Whether the Trial Court Considered Evidence Outside the Administrative Record and Erred in so Doing

{¶ 50} R.C. 1509.37 places limitations on the record available to the court of common pleas in reviewing the commission's decision:

> In the hearing of the appeal the court is confined to the record as certified to it by the commission. The court may grant a request for the admission of additional evidence when satisfied that the additional evidence is newly discovered and could not with reasonable diligence have been ascertained prior to the hearing before the commission.

Though AWMS filed a motion for the common pleas court to consider newly discovered evidence, it orally withdrew the motion at the outset of the common pleas court hearing. (Nov. 1, 2016 Hearing Tr. at 4.)

{¶ 51} The division argues that the common pleas court erred in relying on anything that was not contained within the record of proceedings before the commission. (Division's Brief at 50-54.) The division characterizes the proposed entries submitted by the parties regarding restarting the well as new "evidence" and stated that a USGS report, "2016 One-Year Seismic Hazard Forecast for the Central and Eastern United States from Induced and Natural Earthquakes" was impermissible "evidence" considered by the trial court. *Id.* at 50-53.

{¶ 52} Evidence is defined as "[s]omething (including testimony, documents, and tangible objects) that tends to prove or disprove the existence of an alleged fact; anything presented to the senses and offered to prove the existence or nonexistence of a fact." *Black's Law Dictionary* 673 (10th Ed.2014); *see also Ballentine's Law Dictionary* (2010) ("The means by which any matter of fact, the truth of which is submitted to investigation, may be established or disproved. That which demonstrates, makes clear, or ascertains the truth of the very fact or point in issue, either on the one side or the other."). Proposed entries, solicited by a court after it has rendered a decision, are not materials submitted to establish the truth of any matter of fact. Rather, they are proposals by which a court's decision may take the force of law ("a trial court speaks through its entry"[5]) to efficiently carry out the court's decision. The trial court was free to have solicited proposed entries as an aid in crafting its own entry, except it should not have ordered the Chief to propose a course of action he could not as an expert even testify to as prudent.

{¶ 53} On one page of its entry, the common pleas court relied on a published report of the USGS. (Feb. 21, 2017 Jgmt. Entry at 6, citing Mark D. Petersen, et al., U.S. Geological Survey, *2016 One-Year Seismic Hazard Forecast for the Central and Eastern United States from Induced and Natural Earthquakes*, Ver. 1.1, (June 2016) https://pubs.usgs.gov/of/2016/1035/ofr20161035ver1_1.pdf.) Because the common pleas court used the USGS report to provide background information to notice that Ohio is a

---

[5] *State v. Powers*, 10th Dist. No. 15AP-422, 2015-Ohio-5124, ¶ 18, citing *Infinite Sec. Solutions, L.L.C. v. Karam Properties II, Ltd.*, 143 Ohio St.3d 346, 2015-Ohio-1101, ¶ 29.

relatively placid place geologically, we view it as being used for scientific context, much as we used it in our decision as a lay explanation concerning the nature of "brine," which is a legally defined term according to rule. (Feb. 21, 2017 Jgmt. Entry at 6.) Even though the common pleas court did not admit the USGS report into evidence or purport to take judicial notice of it under Evid.R. 201, the reliability of the information in the public, published report of the USGS has not been disputed by any party, especially when essentially used for scientific context. Even if error exists in relying on it, such error is harmless. Civ.R. 61. We, thus, overrule the division's fourth assignment of error.

## IV. CONCLUSION

{¶ 54} Under statutory requirements, the Franklin County Court of Common Pleas serves as the first appellate reviewer of decisions of the Oil & Gas commission and, thereby, decisions of ODNR Oil & Gas and its Chief. This common pleas court has jurisdiction and authority to reverse decisions of the commission (and thereby of the Chief of the division) and to issue any order the commission or Chief could and should have issued. This court of appeals has authority to affirm, reverse, or modify the decision of the common pleas court for an abuse of discretion in carrying out its appellate function concerning the commission.

{¶ 55} Accordingly, we sustain the division's first assignment of error insofar as we agree that the common pleas court lacked authority to issue an order requiring two members of the commission to participate in oversight of the AWMS No. 2 well. In all other respects we overrule ODNR Oil & Gas' first assignment of error.

{¶ 56} We overrule the division's second assignment of error because we find any error was harmless.

{¶ 57} We sustain the division's third assignment of error in that the trial court based on its decision on impermissible evidentiary inferences made between experts who testified before the division and because the common pleas court drew conclusions about the likelihood of seismic risk without reliable evidentiary support.

{¶ 58} We overrule the division's fourth assignment of error finding that matters asserted to be evidence considered that was outside the record were public, published reports of the USGS and were relied on for scientific context and not specifically as evidence.

{¶ 59} The judgment of the Franklin County Court of Common Pleas is affirmed in part and reversed in part. Accordingly, we modify the common pleas court's judgment pursuant to our authority in R.C. 1509.037, and we affirm the decision of the Oil & Gas commission.

*Judgment affirmed in part, reversed in part,*
*and modified as stated herein.*

TYACK, J., concurs.
LUPER SCHUSTER, J., concurs in part and dissents in part.

LUPER SCHUSTER, J., concurring in part and dissenting in part.

{¶ 60} I agree with the majority's resolution of the division's first, second, and fourth assignments of error. However, because I am unable to agree with the majority's resolution of the division's third assignment of error, I respectfully concur in part and dissent in part.

{¶ 61} In sustaining the division's third assignment of error, the majority seems to conclude the trial court exceeded its authority in determining which expert witnesses to rely on and fashioning an order based on the recommendations of those experts. I find this conclusion to be inconsistent with the majority's resolution of the division's first assignment of error. In its resolution of the first assignment of error, the majority concluded that "[w]hen R.C. 1509.36 and 1509.37 are considered together, notwithstanding the fact that ODNR Oil & Gas has 'sole and exclusive authority' to regulate oil and gas, a common pleas court, sitting in an appellate capacity, is essentially empowered to make any order the Chief could have made." (Majority Decision at ¶ 27.) I agree with the majority's interpretation of R.C. 1509.36 and 1509.37.

{¶ 62} As the majority additionally notes, an appellate court sitting in an appellate capacity reviews a decision of the commission to determine whether the decision was reasonable and lawful. *Simmers v. N. Royalton*, 10th Dist. No. 15AP-900, 2016-Ohio-3036, ¶ 21. If the common pleas court finds the order of the commission to be unreasonable or unlawful, the common pleas court "shall vacate the order and make the order that it finds the commission should have made." R.C. 1509.37; *Simmers* at ¶ 22. On appeal to this court, then, our review is whether the common pleas court abused its

discretion. *Simmers* at ¶ 24, citing *Childs v. Oil & Gas Comm.*, 10th Dist. No. 99AP-626 (Mar. 28, 2000).

{¶ 63} After concluding in its discussion of the division's first assignment of error that the common pleas court had the authority, pursuant to R.C. 1509.37, to issue an order the Chief could have made, the majority then concludes in its analysis of the division's third assignment of error that the common pleas court abused its discretion by reviewing the expert testimony to fashion an order it believed the Chief should have made. I find this conclusion deviates from the standard of review specified in the statutes and reiterated by the majority.

{¶ 64} Instead, I would conclude that the trial court did not abuse its discretion either in determining the order of the commission was unreasonable or in fashioning an order the Chief should have made. Though the majority is correct that the common pleas court must first review an order of the commission to determine whether it is unreasonable or unlawful, that review does not end the analysis. The second prong of the common pleas court's review is that, once it finds an order of the commission to be unlawful or unreasonable, the common pleas court must then fashion an order that the Chief should have made. The majority's resolution of the division's third assignment of error seems to suggest the common pleas court erred by engaging in the same two-step process that the statute directs the common pleas court it must engage. I cannot agree with this conclusion.

{¶ 65} In fashioning the order, I would conclude the common pleas court acted well within its discretion to examine the evidence before it, including the expert testimony presented, and to rely on that evidence to create an order that would be within the scope of authority of the Chief. Because the majority reaches an opposite conclusion, I respectfully dissent.

_____